UNITED STATES AND INTERSTATE COMMERCE COMMISSION *v.* PENNSYLVANIA RAILROAD COMPANY.

UNITED STATES, INTERSTATE COMMERCE COMMISSION, ET AL. *v.* PENNSYLVANIA RAILROAD COMPANY.

APPEALS FROM THE DISTRICT COURT OF THE UNITED STATES FOR THE WESTERN DISTRICT OF PENNSYLVANIA.

Nos. 340, 341. Argued October 18, 19, 1916.—Decided December 11, 1916.

The powers conferred on the Interstate Commerce Commission by the Act to Regulate Commerce, as amended (Acts of February 4, 1887, 24 Stat. 379; March 2, 1889, 25 Stat. 855; June 29, 1906, 34 Stat.

584; and June 18, 1910, 36 Stat. 539), do not include the power to require carriers to provide and furnish oil tank cars—no question of discrimination being involved.

Without attempting to define the measure of the carrier's duty to satisfy the needs of shippers by adding in quantity or kind to its car equipment, *held,* that neither by the Act of 1887 nor the amendatory Act of 1906 did Congress intend that the enforcement of such duty might be compelled by orders of the Interstate Commerce Commission.

In reaching this conclusion much weight is properly attached to the fact that it accords both with the construction placed by the Commission upon the Act of 1887 before the Act of 1906 was adopted and also with the explanation which the Commission made to Congress concerning the occasion and scope of the Act of 1906 when that statute was in process of enactment.

In construing the amendment of 1906, the fact that, as here involved, it was drawn and recommended by the Commission justifies in this case the assumption that in legal import it was not intended to exceed the Commission's recommendation.

The neglect or refusal to furnish tank cars is not a "practice" within the meaning of § 15 of the Commerce Act, as amended June 18, 1910.

When a carrier in its published tariffs denies any obligation to furnish tank cars, the fact that it publishes rates for commodities so carried may not be construed as an offer, constituting a duty, to furnish such cars; and a finding by the Commission to the contrary is reviewable as a conclusion of law.

Whether the order of the Commission was invalid because requiring the Railroad Company to supply cars for movement over other lines, or because of being non-administrative, or uncertain and indefinite— not decided.

*Chicago, Rock Island & Pacific Ry. Co.* v. *Hardwick Elevator Co.,* 226 U. S. 426, and other decisions of this court, explained and distinguished.

227 Fed. Rep. 911, affirmed.

ON petition of the Pennsylvania Paraffine Works and the Crew-Levick Company the Interstate Commerce Commission made the following order:

"It is ordered, That the Pennsylvania Railroad Company be, and it is hereby, notified and required to cease and desist, on or before August 15, 1915, and thereafter to

abstain, from refusing upon reasonable request and reasonable notice therefor to provide and furnish tank cars to the complainants herein for interstate shipments of petroleum products, which refusal has been found in said report to be in violation of the provisions of the act to regulate commerce and amendments thereto.

"It is further ordered, That said defendant be, and it is hereby, notified and required to provide; on or before August 15, 1915, and thereafter to furnish, upon reasonable request and reasonable notice, at complainants' respective refineries, tank cars in sufficient number to transport said complainants' normal shipments in interstate commerce.

"And it is further ordered, That this order shall continue in force for a period of not less than two years from the date when it shall take effect."

The time of compliance was subsequently extended to November 15, 1915. In the meantime, the railroad company brought this suit to enjoin the enforcement of the order. A preliminary injunction was prayed and, upon a hearing by three judges, was granted. 227 Fed. Rep. 911. To review that action this appeal is prosecuted.

The Commission made quite elaborate findings, which, however, we do not think it is necessary to quote in full. It found the production of the oil companies, and the following additional facts:

(1) That 91% of the oil produced by the Paraffine Company was shipped in tanks, 1½% in barrels loaded in cars other than tank cars, and 7½% in pipe lines, while of the shipments made by the other company 86.8% moved in tank cars, 4.7% in barrels, and 8.5% in pipe lines.

(2) For a long time the bulk of refined oil in the United States has been shipped in tank.cars and at present 91% is so transported. The railroad has been using tank cars for twenty-five years. The capacity of the cars is found, and they are so constructed that they may be rapidly

loaded at the refineries, and jobbers and dealers in refined oil throughout the country have the proper and necessary facilities for unloading the cars by gravity at their various stations.

(3) The only other method of transporting oil is in barrels or similar containers, the cost of which is from $3\frac{1}{2}$ to $3\frac{3}{4}$ cents a gallon above the cost of transportation in tank cars, and this makes such method of transportation practically prohibitive, and the refusal of the railroad to furnish an adequate supply of tank cars would tend to drive out of business refiners who are unable to supply themselves with enough cars to move their own products; and witnesses for the railroad admitted that tank cars are an economic necessity for the transportation of refined products.

(4) In 1887 the railroad acquired 1308 tank cars, some of which have since been sold to independent refiners, but it owned at the time of the hearing 499 cars, of which 482 are furnished to shippers of oil located on its lines.

(5) At the time of the hearing the Paraffine Company owned 54 tank cars and the Crew-Levick Company 57; and it was testified that these companies for five or six years have daily made inquiry for the delivery of cars to them and that formal orders for cars have been constantly on file in the railroad's offices.

(6) On November 11, 1912, shortly before the filing of the complaints before the Commission, complainants served notice upon the railroad company, requesting it to furnish a sufficient number of tank cars to ship respectively 450,000 gallons of oil per month from the Paraffine Company's refinery at Titusville and 600,000 gallons per month from the Glade (Crew-Levick Co.) Oil Works at Warren.

To the request of complainants, the railroad company replied:

"We beg to say that the ra lroad company is not pre-

pared to increase its present tank-car equipment but is prepared to transport the commodities in question when properly contained in barrels or other similar containers at rates that are fair, reasonable, and nondiscriminatory."

*The Solicitor General,* with whom *Mr. Robert Szold* was on the brief, for the United States:

The railroad is under a legal duty to furnish oil tank cars upon reasonable request.

The common law requires the common carrier to furnish reasonably adequate facilities for the transportation of the class of goods which it professes to carry. *Covington Stock-Yards Co.* v. *Keith,* 139 U. S. 128, 133; Hutchinson on Carriers, 3d ed., § 495; Beale and Wyman, Railroad Rate Regulation, 2d ed., § 930.

The obligation is not simply to devote the specific property on hand to the public use, but to render adequate transportation service. Wyman on Public Service Corporations, §§ 253, 260, 797; *The Southwark,* 191 U. S. 1, 9. See also *Lukrawka* v. *Spring Valley Water Co.,* 169 California, 318, 329–332; *Haugen* v. *Albina Light & Water Co.,* 21 Oregon, 411; *Columbus* v. *Mercantile Trust Co.,* 218 U. S. 645, 659; *Leavell* v. *Western Union Telegraph Co.,* 116 N. Car. 211, 221; *United States Telephone Co.* v. *Central Union Telephone Co.,* 202 Fed. Rep. 66.

Additional equipment must be provided if necessary to accommodate reasonable public demands. *Branch* v. *Wilmington &c. R. R. Co.,* 77 N. Car. 347, 350; *Cobb* v. *Illinois Central R. R. Co.,* 38 Iowa, 601, 623; *Illinois Central R. R. Co.* v. *River & Coal Co.,* 150 Kentucky, 489, 491, 493; *Yazoo & Miss. Valley R. R. Co.* v. *Blum Co.,* 88 Mississippi, 180, 191, 192; *Ocean Steamship Co.* v. *Savannah Supply Co.,* 131 Georgia, 831; *People* v. *St. Louis &c. Railroad Co.,* 176 Illinois, 512.

Special facilities such as tank cars must be provided even though previously the railroad has not held itself

out so to do.  *Baker* v. *Boston & Maine R. R. Co.*, 74 N. H. 100, 110; *Kansas Pacific Ry.* v. *Nichols*, 9 Kansas, 235; *State* v. *Railway Co.*, 47 Ohio St. 130, 139; *Railroad Co.* v. *Pratt*, 22 Wall. 123; *Covington Stock Yards Co.* v. *Keith, supra; Loraine* v. *Pittsburg &c. R. R. Co.*, 205 Pa. St. 132; *Atlantic Coast Line R. R. Co.* v. *Geraty*, 166 Fed. Rep. 10; *Mathis* v. *Southern Ry.*, 65 S. Car. 271; *Cincinnati &c. Ry. Co.* v. *Fairbanks & Co.*, 90 Fed. Rep. 467.

This railroad has held itself out specifically to carry oil in tank cars.  In its answer before the Commission it alleged that in the schedules of rates filed for carrying articles in tank cars it stated that no obligation was assumed to furnish tank cars.  But the fact of such disclaimer does not appear from the record in the cases at bar.  The obligation seems to be a matter of law, which follows as a necessary incident from the fact of the holding out and the public nature of the carrying business.  See *Lloyd* v. *Haugh*, 223 Pa. St. 148, 154.  The Commission's finding of fact that the railroad has held itself out to carry oil in bulk and in tank cars is not reviewable.  *United States* v. *L. & N. R. R. Co.*, 235 U. S. 314, 320.

The duty is clearly imposed by the Hepburn Act of June 29, 1906, c. 3591, 34 Stat. 584, § 1.

Whatever be the duty at common law, here is an obligation of the statute to *provide* the required cars—not merely furnish such cars as chance to be on hand.

Recent decisions in this court recognize the obligation imposed.  The comprehensive character of the amendment was indicated in *Chicago &c. Ry. Co.* v. *Hardwick Elevator Co.*, 226 U. S. 426.  The case has been followed many times: *Yazoo &c. R. R. Co.* v. *Greenwood Grocery Co.*, 227 U. S. 1; *St. Louis &c. Ry. Co.* v. *Edwards*, 227 U. S. 265; *M., K. & T. Ry. Co.* v. *Harris*, 234 U. S. 412, 418; *Menasha Co.* v. *Chicago & Northwestern Ry.*, 241 U. S. 55, 58; *Ellis* v. *Interstate Com. Comm.*, 237 U. S. 434.

The evil to be remedied by the amendment of 1906

was in part the public injury due to insufficiency of the railroad's supply of tank and refrigerator cars. *Scofield* v. *Lake Shore &c. Ry. Co.*, 2 I. C. C. 90, 117 (1888); *In re Transportation of Fruit,* 10 I. C. C. 360, 373 (1904); Special Message by the President, of May 4, 1906; Report of the Commissioner of Corporations on the Transportation of Petroleum, 1906, House Doc. 812, 59th Cong., 1st sess.; see Sen. Doc. 428, *id.*, Cong. Rec., vol. 40, pt. 7, p. 6358; Cong. Rec., 59th Cong., 1st sess., vol. 40, pt. 2, p. 1958.

The legislative history of the amendment of 1906 shows that it was designed to meet this evil. Cong. Rec., 59th Cong., 1st sess., vol. 40, pt. 2, pp. 1764, 1765, 2005, 2109, 2155; *id.*, pt. 3, pp. 2081, 2103, 2104, 2109, 2155, 2241, 2260; *id.*, pt. 7, pp. 6374–6375, 6376, 6438, 6440, 6570.

The Commission has power to order the carrier to comply with a reasonable request to furnish oil tank cars. In support of the Commission's power, the Government relies particularly upon §§ 1, 12, and 15, as amended. Section 12 imposes upon the Commission the authority and duty "to execute and enforce the provisions of this act." Act of March 2, 1889, c. 382, 25 Stat. 858. One of the provisions which it is thus made the duty of the Commission to enforce is § 1, requiring railroads to furnish cars. The very purpose of imposing upon the carrier in 1906 the duty to furnish cars was to give the Commission jurisdiction to enforce that duty. This seems clear from a simple reading of the statute, as also from the debates, *supra.*

It is settled that a governing principle in the construction of the Commission's powers under the amendment of 1906 is the recognized purpose of the amendment to grant speedy and efficacious remedies for the enforcement of the duties imposed. *Baltimore & Ohio R. R. Co.* v. *Pitcairn Coal Co.*, 215 U. S. 481, 498, 499.

The amendment of 1910 serves to remove all doubt.

The order in question deals with a regulation or practice of the railroad in furnishing the facilities of transportation, and § 15 in explicit terms authorizes the Commission by order to prescribe regulations or practices of that character. Rates and rebating had already been dealt with; the object of this amendment was to insure proper service.  See the report of the Committee on Interstate and Foreign Commerce which, on April 1, 1910, recommended the bill to amend the Interstate Commerce Act, H. R. 17536, House Report No. 923, 61st Cong., 2d sess.; Cong. Rec., 61st Cong., 2d sess., vol. 45, pt. 5, p. 4571; *id.*, pt. 6, p. 5852; Conference Report No. 1588 on House Bill 17536, Sen. Doc. No. 623; Cong. Rec., vol. 45, pt. 8, pp. 8134 *et seq.*

That the power conferred upon the Commission was intended to be most comprehensive is shown by the terms of § 15.  The words are "*any* individual or joint classifications, regulations, or practices *whatsoever.*"  A regulation is a written rule governing a method of doing business.  A practice clearly is not limited to such methods as have become habits.  It includes any manner of performing the duties imposed by the act.

Consideration of the amendment to § 1 in the Act of 1910 also shows the all-embracing character of the practices over which the control of the Commission was extended.  Section 1, as appears from the committee report recommending the legislation of 1910, is to be read in connection with § 15.

The railroad company's refusal was in writing and laid down a permanent rule.  It was a regulation or practice as found by the Commission—a finding of fact which not being entirely unsupported by evidence, must be taken as conclusive.  All the members of the court below agreed that the order dealt with a practice—a view fully sustained by *Atchison Railway Co.* v. *United States*, 232 U. S. 199; *Loomis* v. *Lehigh Valley R. R. Co.*, 240 U. S. 43, 50; *New*

*York Shippers' Ass'n* v. *New York Central &c. R. R. Co.,* 30 I. C. C. 437; *Protection of Potato Shipments in Winter,* 26 I. C. C. 681, 685; *National Lumber Dealers' Ass'n* v. *Atlantic Coast Line R. R. Co.,* 14 I. C. C. 154; *Millers' Club* v. *Railroad Co.,* 26 I. C. C. 245; *Farmers Co-op. Ass'n* v. *Railroad Co.,* 34 I. C. C. 60; *Montgomery* v. *C., B. & Q. R. R. Co.,* 228 Fed. Rep. 616; *Newmark Grain Co.* v. *Southern Pacific Co.,* 30 I. C. C. 431.

The order was within the jurisdiction of the Commission even if not strictly a practice. Section 12 is here relied on and the concluding paragraph of § 15. The tendency of this court has been to uphold the broad powers granted. *Pipe Line Cases,* 234 U. S. 548. The policy of the act as a whole relies on expert and uniform administrative control rather than judicial orders.

The question whether the duty to provide and furnish cars is violated is administrative, and uniform control by the Commission is requisite. *Loomis* v. *Lehigh Valley R. R. Co., supra; Minnesota Rate Cases,* 230 U. S. 352, 419, 420; *Mo. & Ill. Coal Co.* v. *Ill. Central R. R. Co.,* 22 I. C. C. 39; *St. Louis &c. Ry. Co.* v. *Arkansas,* 217 U. S. 136, 150.

Control by the Commission is imperatively required if the purpose of the act to prevent discrimination is to be effectuated. *Balto. & Ohio R. R. Co.* v. *Pitcairn Coal Co., supra; Interstate Com. Comm.* v. *Ill. Central R. R. Co.,* 215 U. S. 452; *Texas & Pac. Ry. Co.* v. *Abilene Oil Co.,* 204 U. S. 426.

The order involves the exercise of no new or unusual power by the Commission.

The order is not subject to the objection that it compels the use of cars beyond the line of the railroad. *Mich. Central R. R. Co.* v. *Mich. R. R. Comm.,* 236 U. S. 615, 631, 632; *Pennsylvania Co.* v. *United States,* 236 U. S. 351.

The order is not void because indefinite or uncertain.

It follows the statute; seems as definite as that upheld in *Pennsylvania Co.* v. *United States, supra,* (see also *Baltimore & Ohio R. R. Co.* v. *Interstate Com. Comm.,* 221 U. S. 612, 621, 622); and is as specific as it could reasonably be. The objection here is premature, the railroad having made no effort to comply.

The order does not require an unlawful interference with the rights of owners of private cars. It affords sufficient time for compliance.

*Mr. Joseph W. Folk* for the Interstate Commerce Commission.

*Mr. Charles D. Chamberlin* and *Mr. David Wallerstein* filed a brief for the Crew-Levick Company.

*Mr. John G. Johnson* and *Mr. Thomas Patterson,* with whom *Mr. Henry Wolf Biklé* and *Mr. F. D. McKenney* were on the brief, for the Pennsylvania Railroad Company.

By leave of court, *Mr. Charles W. Atwater* and *Mr. Samuel B. Clarke* filed a brief in behalf of the Sterling Salt Company, as *amici curiæ.*

MR. JUSTICE MCKENNA, after stating the case as above, delivered the opinion of the court.

The question in the case is, Has the Commission the jurisdiction exercised by the order? It is not denied that the Commission has power over the general equipment of a carrier, but it is denied that it has power to require "vehicles of a special type having no reference to the safety of transportation," and to this distinction the argument of counsel for the railroad company, is addressed.

The judgment of the District Court had somewhat broader basis. The court said: "The act to regulate com-

merce does not confer upon the Interstate Commerce Commission all power over cars and other instrumentalities of shipment." And that, aside from special enactments, "Federal legislation regulating commerce, in so far at least as it is contained in the act of 1887 and its amendments, has thus far left carriers free to exercise their own judgment in the purchase, construction and equipment of their roads and in the selection of their rolling stock." Indicating that the law conferred upon the Commission the power to prevent and redress unfair practices and discriminations, the court further said: "We find nothing in the law which confers upon the Commission power to compel a carrier to acquire facilities it does not possess or to acquire better facilities than those it possesses, not with the object of preventing discrimination and preferences, but in order that the shipper may have larger, better, and perhaps more economical facilities."

And coming to consider the question of power conferred by the Interstate Commerce Act of 1887 as amended in 1906, the court decided that the amendment "added nothing to the original duty of the carrier as prescribed by the original act and as interpreted by the Commission, and vested in the Commission no increase of power over cars as instrumentalities of shipment."

To this proposition the United States and the Commission oppose the contentions that "it is the duty of every interstate carrier to provide and furnish upon reasonable request such cars as are reasonably necessary for handling the normal traffic of which it is a common carrier," and that the Commission is given jurisdiction to enforce the duty.

The power of the Commission has been given precedence and dominance in the argument, the extent of the duty of carriers coming in secondarily though important to be considered. In other words the main question pre-

sented is, whatever be the duty of carriers as to the equipment they must have or furnish, whether the Interstate Commerce Commission is the tribunal to enforce the duty.

A comparison of the act as passed in 1887 with the amendment of 1906 becomes necessary and a consideration of the rulings under the former as an interpreter of the latter.

The Act of 1887 (24 Stat. 379) provided that—

"The term 'railroad' as used in this act shall include all bridges and ferries used or operated in connection with any railroad, and also all the road in use by any corporation operating a railroad, whether owned or operated under a contract, agreement, or lease; and the term 'transportation' shall include all instrumentalities of shipment or carriage."

The word "transportation" is the crucial word, and its definition in the amendment of 1906 is as follows:

". . . . and the term 'transportation' shall include cars and other vehicles and all instrumentalities and facilities of shipment or carriage, irrespective of ownership or of any contract, express or implied, for the use thereof and all services in connection with the receipt, delivery, elevation, and transfer in transit, ventilation, refrigeration or icing, storage, and handling of property transported; and it shall be the duty of every carrier subject to the provisions of this Act to provide and furnish such transportation upon reasonable request therefor . . ." And this, it is contended, must be read in connection with § 12, as amended March 2, 1889, as follows:

". . . and the Commission is hereby authorized and required to execute and enforce the provisions of this act." 25 Stat. 855, 858.

Section 1 of the Act of 1887 came before the Commission for consideration, and the duty thereunder of carriers to furnish tank cars for the transportation of petroleum, in

*Scofield* v. *Lake Shore & Michigan Southern Railway Co.,*
2 I. C. C. 90. The opinion is too long to review. It is
enough to say of it that it considered the conditions of
the oil trade, the different methods of shipping oil in
barrels and in tank cars, and stated that the latter method
had become established, though very few of the railroads
of the country owned tank cars; compared the cost and
advantages of the methods, and from this declared that
it was obvious that where the carriers did not furnish tank
cars one shipper could not compete in all respects upon
equal terms with another shipper who furnished tank cars
for the transportation of his oil, unless he also furnished
tanks; and, following a former decision, declared that it
was properly the business of the carrier to supply the
rolling stock for the freight he offers or proposes to carry,
and that if the diversities of the traffic are such that this
is "not always practicable, and consignors are allowed to
supply it themselves, the carrier must not allow his own
deficiencies in this particular to be made the means of
putting at an unreasonable disadvantage those who make
use in the same traffic of the facilities he supplies." To
prevent such disadvantages or preferences the Commission
decided it had power; to enforce the duty of supplying
cars it decided it had not the power.

Section 3 of the act was asserted against the conclusion,
and the Commission replied that that section applied only
to facilities between connecting lines and did not embrace
car equipment for the origination of freight; and, referring
to § 1, it was said:

"The term 'instrumentalities of shipment or carriage,'
as found in the first section of the statute, of course in-
cludes cars, but they are such cars as are provided by the
carrier or used by it in interstate commerce, and the
statute nowhere clothes the Commission with power to
determine what kind of cars the carrier should use for this
purpose and require the carrier to place upon its line for

use in this business such kind and number of cars as the Commission may decide will constitute a proper and necessary equipment of car service. The duty of every such carrier is none the less obligatory at common law, and by its charter to furnish an adequate and proper car equipment for all the business of this character it undertakes and advertises in its tariffs it will do. The statute does not undertake to clothe the Interstate Commerce Commission with the power by summary proceeding of compelling a railroad company to perform all its common-law duties, but leaves many of these to be enforced in the courts by suits for damages and by other proceedings. . . .

"The power, if it should be held to exist at all, on the part of the Interstate Commerce Commission to require a carrier to furnish tank cars when that carrier is furnishing none whatever in its business, would apply equally to sleeping cars, parlor cars, fruit cars, refrigerator cars, and all manner of cars as occasion might require, and would be limited only by the necessities of interstate commerce and the discretion of the Interstate Commerce Commission. A power so extraordinary and so vital, reached by construction, could not justly rest upon any less foundation than that of direct expression or necessary implication, and we find neither of these in the statute."

And it was declared that the law-making power had not itself undertaken the responsibility or clothed the Commission with the responsibility of directing a carrier to supply itself with any particular kind of equipment or cars, or, in fact, any equipment or cars at all for the transportation of freight over its line. It will be observed, therefore, that all of the elements that entered into the problem of the power of the Commission and the reasons which seemed to impel its exercise were considered.

There was a repetition of the elements and decision *In re Transportation, etc., of Fruit,* 10 I. C. C. 360, 373 (1904). It was there said that the Commission was of opinion

that it was the duty of railroad companies to furnish refrigerator cars for the transportation of fruit; that at one
time carriers might have declined to provide this special
kind of equipment but that the trade had so grown that
the carriers "might as well decline to provide stock cars
for the transportation of live stock as refrigerator cars for
the carriage of perishable commodities." It was, however,
added, "But this duty does not spring from the Act to
regulate commerce, nor has this Commission any jurisdiction of that matter. It arises out of the common-law
liability of the defendant railway companies as common
carriers, and redress for failure to fulfill it must be sought
in the courts."

Certain abuses were pointed out in that case and the
tendency of the ownership of cars by private car lines to
monopoly, and as a consequence it was urged upon the
Commission that carriers should not be permitted to make
exclusive contracts with private car lines like those then
under consideration but should be compelled to provide
their own equipment. The Commission replied, at page
377: "The facts before us call for no expression of opinion
on that subject, and none is attempted."

This, then, was the view of the Interstate Commerce
Commission of the duty of carriers and of its power over
them; that is, that it was the duty of carriers to provide
and furnish equipment for transportation of commodities
and that this duty might expand with time and conditions, the special car becoming the common car, and the
shipper's right to demand it receiving the sanction of law.
But the Commission decided it was the sanction of the
common law, not of the statute, and that the remedy was
in the courts, not in the Commission. With this view we
start as the first element of our decision.

But a change in the statute and remedy is asserted, a
change, it is further asserted, consequent upon a demand
for a greater administrative power and remedy. To sus-

tain the assertions the reports of the Commission are adduced, the legislation it recommended and the comments of the legislators.

It is especially to be noted that the amendment of 1906 is in the exact language of the recommendation of the Commission, as far as concerns that part which defines "railroad" and "transportation."

The Senate Committee on Interstate Commerce had instituted an extended inquiry and members of the Commission appeared before the special committee which had been appointed and presented a bill which the commissioners said embodied their recommendations and which the Commission subsequently made part of its nineteenth annual report. Significant explanations accompanied the bill. It was stated: "The form of the proposed measure, as will appear upon inspection, is an amendment of certain sections of the present statute. . . . Aside from the main question—the grant of power to the Commission, after hearing, to fix the future rate—several other amendments are proposed with the view of improving the law as a remedial measure, and these amendments will now be referred to under appropriate headings," one of which was as follows:

## "*Enlargement of Jurisdiction.*

"It will be seen that the changes proposed in the first section are designed (*a*) to somewhat increase the jurisdiction of the law as to the carriers subject to its provisions and (*b*) to bring within the scope of the law certain charges and practices which are not now subject to regulation or respecting which there is dispute as to the power of the Commission. The first purpose is accomplished by leaving out of the first paragraph the phrase 'under a common control, management, or arrangement,' in order to reach certain classes of carriers which are now exempt from the obligations and requirements of the act. The second pur-

pose is sought to be accomplished by enlarging the definition of the term 'transportation,' so as to include the charges for various services, such as refrigeration and the like, which are now claimed to be beyond our authority. The obligation to furnish and provide the services here referred to is also imposed, which is likewise a point now in dispute. No other changes are proposed in the first five sections of the act, which are commonly spoken of as containing its principal or substantive provisions. In other words, the only amendment suggested in this regard is an enlargement of jurisdiction. In this connection, and as illustrative of the matters here referred to, the subject of refrigeration charges may be properly considered."

Then follows a consideration of refrigeration charges, the dispute that existed as to whether the shipper or the carrier should bear the expense of refrigeration, and the controversy over the jurisdiction of the Commission. It was said that "the Congress ought to make that service, by express provision in the law, a part of the transportation itself. We do not at this time recommend that carriers should be prohibited from using private cars or from employing the owners of such cars to perform the icing service if they find that course to their advantage, but we do recommend that these charges should be put on the same basis as all other freight charges. They should be published and maintained the same as the transportation charge, and be subject to the same supervision and control."

Under the heading "Terminal Roads, Elevator Charges, and Private Cars," the following was said:

"It has been suggested that the Congress should prohibit railways from employing any agency or using any facility in the transportation of property which is furnished by the owner of the property. We should hesitate to recommend at this time so drastic a measure as that.

Assuming that such a law would be a constitutional exercise of authority, it would seriously interfere with property rights which have grown up under the present system. Moreover, there are many instances in which the service can be rendered or the facility furnished more advantageously both to the shipper and railway and without injury to the public if provided by the shipper himself."

After commenting on the amendment to § 16 and the added § 16a, the Commission explained that—

"It will thus be seen that the substantial amendments proposed are few in number and easily understood, the remaining changes being merely such as are needful to harmonize other parts of the act with the main amendments. . . . In brief, the proposed measure amends certain sections of the act to regulate commerce and is confined to such recommendations as are deemed necessary to effect its intended purpose, and thereby furnish adequate protection against excessive and discriminating charges."

It will be observed that there is not one word in the report that indicates that there was a necessity or desire for the power exercised in the order under review. Indeed, there was directly expressed an approval of private cars, and the opinion declared that they were a facility which could be furnished more advantageously both to the shipper and the railroad, without injury to the public, if provided by the shipper himself, and the recommendation was that they be brought under the jurisdiction of the Commission and thereby prevent 'oppressive and discriminatory practices; the principle being, to borrow from another, that all services incident to transportation, whether primary (carrying the goods) or accessorial (caring for the goods in transit whenever such care calls for special facilities or special equipment), should be subject to the same supervision and regulation.

But is there anything in the words of the amendment which exhibits on the part of Congress a larger knowledge of conditions than the Commission had, and that Congress, in a broader comprehension and judgment of the conditions and their remedy, gave the Commission a greater jurisdiction than that which in any way occurred to it was necessary?

The act as it was enacted in 1887 defined the term railroad and the term transportation, the latter as follows: "And the term 'transportation' shall include all instrumentalities of shipment or carriage." The definition was very comprehensive, and needed not the mobilization of its denotation; but this subsequently was attempted. Words, indeed, were multiplied—was meaning changed?

In 1906 the term "transportation" was defined to "include cars and other vehicles and all instrumentalities and facilities of shipment or carriage. . . ." The words are not much less general than the words of the Act of 1887. There is no advance made by them or enlargement of meaning. There was simply a useless tautology. But granting it was not and that Congress deemed a special declaration of things to be necessary, such declaration did not alter the relation of the companies to them. The duty which attached to "instrumentalities" of the Act of 1887 attached to the things covered by its comprehensive generality—to the things declared in the amendment of 1906, that is, to "cars," "vehicles," "facilities." And this duty under the Act of 1887, we have seen, had, in the opinion of the Commission, the sanction only of the common law. Under the amendment the most that can be said is that the duty is particularized. Its sanction is not enlarged.

But other words occur which, it is contended, have such effect. These words are: "And it shall be the duty of every carrier . . . to provide and furnish such transportation upon reasonable request therefor . . ."

This however is but the expression of a necessary implication. It was useless to declare that whatever a carrier must do, he must do "upon reasonable request." The duty having been imposed, it necessarily could be demanded. But the expression of the right, if it needed expression, adds nothing of indication to the previous words of the tribunal by which the demand was to be enforced.

But it is said the duty having explicit declaration the power to enforce it was found in § 12 as amended March 2, 1889, as follows: "And the Commission is hereby authorized and required to execute and enforce the provisions of this act." 25 Stat. 855, 858.

But this casts us back to our general considerations to which we may only add that there was no question of the duty of carriers either under the Act of 1887 or under the amendment of 1906. It was their duty under both to furnish the instrumentalities of transportation. The question is whether under the latter, as under the former, jurisdiction to enforce the duty was at common law in the courts or under the statute and in the Commission; and we have seen that it was the view of the Commission that the remedy was in the courts and that the amendment of 1906 was not intended to and did not change the remedy. In other words, that Congress in effect accepted the explanation of the Commission and approved its decisions. We repeat, the amendment of 1906 was drawn by and recommended by the Commission, and it may be assumed was not intended to have nor given larger import in the law than it had in the recommendation. *United States* v. *Louis. & Nash. R. R.*, 236 U. S. 318, 333 *et seq.*

There was amendment in 1910, not of § 1 in any particular relevant to our discussion, but of §§ 13 and 15. It was said by the committee which reported them for consideration that under § 15 as it then stood the author-

ity of the Commission to enter an order was "confined to the subject-matter of rates for transportation and regulations or practices 'affecting such rates' and the establishment of through routes where 'no reasonable or satisfactory through route exists.'" And the committee added that as recommended to be amended § 15 "will have its scope largely increased and the jurisdiction of the Commission will be much enlarged;" and that by the amendment the Commission is given jurisdiction to enter orders not only regarding rates but regarding classifications, regulations, or practices, whether they affect rates or not, and make orders requiring conformity thereto.

"Practices" were not otherwise or precisely defined either in the report or in the amendment recommended and as finally passed. Regarding only its broad generality anything may be asserted of it; regarding its context and the conditions which existed an immediate limitation of it is indicated, made necessary, as we shall presently show.

Section 15 provides that whenever after full hearing as provided by § 13 the Commission should be of opinion that any individual or joint rates collected by a common carrier or "that any individual or joint classifications, regulations, or *practices* whatsoever of such carrier or carriers subject to the provisions" of the act are "unjust or unreasonable or unjustly discriminatory, or unduly preferential or prejudicial or otherwise in violation of any of the provisions of" the act, the Commission is authorized and empowered to determine and prescribe what shall be the just and reasonable rate or rates and "what individual or joint classification, regulation, or *practice* is just, fair, and reasonable," and make an order that the carrier shall cease and desist from the charging of excessive rates and shall adopt the classification and conform to and observe the regulation or practice prescribed; the order to continue such time not exceeding two years as shall be prescribed by the Commission.

Applying the section, it is contended that the neglect to provide or certainly the refusal to furnish tank cars is a "practice" and became especially so by the reply made by the railroad to the request to furnish them.

Let us test the contention and see where it takes us. The request was for a special facility, a combination of package and car, and the question then is whether the neglect to provide it or to furnish it was a "practice" within the meaning of § 15. The far-reaching effect of an affirmative answer is instantly apparent, and there must be hesitation to declare it from the use of so inapt a word as "practice." Following a well known rule of construction, we must rather suppose its association was intended to confine it to acts or conduct having the same purpose as its associates. And there were many such acts for which the word could provide—practices which confused the relation of shippers and carriers, burdened transportation, favored the large shipper and oppressed the small one. These have illustrations in decisions of the Commission. And this was purpose enough, remedied all that was deemed evil in privately owned cars of any type. Beyond that it was not necessary to go; beyond that there were serious impediments to going; and we cannot but believe that if beyond that it was intended to go there would have been explicit declaration of the intent, with such provision as to notice and time and preparation as its consequences would demand—not ambushed in obscurity and suddenly disclosed by construction to turn accepted custom into delinquency, a construction that could be disputed and was disputed.

Three commissioners out of seven dissented, they declaring that if the act conferred power upon the Commission to order a carrier to enlarge its complement of cars it would follow that the Commission had also the power to order enlargement of terminal facilities, increase in the number of locomotives, and extension of tracks or branches.

In fact, it was said that no facility of transportation would
be exempt.   The purpose of the provision reviewed was
declared to be the regulation of facilities possessed by
the carrier, that there should be no unjust discrimination,
and the plain intent to be that the shipper should not be
required to deal with any other than the carrier.   And
this, as far as we can glean from the extensive congres-
sional literature, was the end sought.   In other words, it
was on account of the abuses of the private car system,
not of its uses, that legislation was urged.

There was some sentiment outside of the Commission
for the abolition of the private car system, but abolition
was not attempted.   It would have been a short cut to
the solution of the problems and could easily have been
accomplished by requiring the railroads to furnish all of
the equipment necessary for taking care of all kinds of
traffic.   But neither the Government nor the Commission
contends for such an extreme, and, to forestall the charge
that the order has such tendency, each represents that the
duty of the carrier to furnish special equipment is not ab-
solute but relative to the conditions of trade and the busi-
ness of the shipper.   This weakens the principle upon which
the duty is based.   If there be a duty, it would seem neces-
sarily to be universal.   And such contention is growing.

A friend of the court appears in the form of a Salt Com-
pany and presents an argument in support of the order
of the Commission and asserts the right to a special equip-
ment for the transportation of salt in bulk.

Little more need be said.   Private cars came into ex-
istence as conveniences or necessities to particular busi-
nesses, developing by degrees and differentiating accord-
ing to conditions.   It was said in argument that there are
different kinds of tank cars for different oils and liquids,
and there are cars for live stock, fruit, live poultry, milk,
and, as we have seen, salt in bulk.   What others there are
neither the record nor the argument has given us informa-

tion, nor the extent of their specialization. However, the information is not needed. The facts of the present case illustrate the condition of the carriers of the country. Describing it, the Commission says:

"The bulk of the movement of refined oil is in tank cars owned by the shippers. In 1887 the Pennsylvania Railroad acquired 1,308 tank cars, some of which have subsequently been sold to independent refineries. Defendant now owns 499 tank cars, all that remain of those purchased in 1887 and 482 of which are furnished to shippers of oil located on its lines. The other railroads east of the Mississippi River own, in the aggregate, only 303 tank cars. The privately owned tank cars east of the Mississippi aggregate about 27,700, and the total number of tank cars owned in the United States was given as approximately 40,000."

This, then, was the situation of the railroad, not dissimilar to that of other railroads, not therefore created in deliberate fault but in accommodation to conditions useful to shippers, advantageous to the railroad, beneficial to the public, as the Commission had declared; and yet a change is suddenly required. The burden of the requirement we shall presently notice.

Of course, if there is a duty upon a carrier to furnish tank or other special cars upon request, its enforcement cannot be arrested by the burden it imposes; but here again the thought obtrudes, which we have already expressed—it may be to tiresome extent—that if Congress had intended such consequence with all that it implies of expense, directly and indirectly, it would not have left its intention to be evolved from obscure language but would have put it in explicit declaration and with notice and time for accommodation to it.

It is to be remembered that the tank car is both package and car, must have special mechanical means of loading and unloading. May these, too, be ordered? Are they

not a "manner and method of presenting, marking, packing, and delivering property for transportation," to use the language of § 1, as amended?

It is difficult to particularize all that the ruling of the Commission implies of power. What of omission or commission in the carrier's relation to the public may not be said to be a practice or practices in the broad sense attempted to be given to those words? A railroad's powers are its duties, bearing, of course, obligations; and all of them by the asserted construction are swept under the jurisdiction of the Commission—so swept by a single word, not of itself apposite, and determined besides, by its association, against the contention. This was apparent to the dissenting commissioners and repelled their concurrence. Well might they have recoiled from going to such extreme upon doubtful implication and have been impelled to declare as they did declare that if such power was given it logically and necessarily extended to every facility of transportation.

As to whether this is desirable, we express no opinion, and we only mean now to say that it was not expressed as desirable in the statutes which we have considered, nor was there a word or a line from the Interstate Commerce Commission, so far as the record shows or intimates, of recommendation of such result. Indeed, there is intimation that such result would be radical and, as said by the railroad company, "the Safety Appliance Acts indicate that when Congress contemplates the imposition of obligations with respect to the equipment of carriers, it covers the subject by careful specific rules." And we may further say with the company that "it is pertinent to inquire why committees of Congress should consider, as they continue to do from time to time, the wisdom of devolving on carriers the duty to furnish steel coaches for passenger traffic, if already the provisions of the Act to Regulate Commerce are broad enough to cover matters of this kind." And

there is strength in the observation of the railroad company that if the argument based upon the word "practice" or "practices" were sound "it could be contended with equal reason that every detail of railroad operation is a practice within the meaning of. the Act, why should the Commission ask that it.be empowered to require the use of the block signal system? (Report of 1913, page 82.) Why should the Commission make this request if, because of its jurisdiction with respect to practices, it is already endowed with power to regulate the details of operation of carriers?"

The United States and the Commission insist that they have authority of cases for their two fundamental propositions, to-wit: (1) That it is the duty of the railroad to furnish equipment for the transportation of products; and (2) That the Commission has the jurisdiction to enforce that duty.

The authorities upon the first proposition we are not concerned to review. The duty, as far as this question is concerned, may be admitted—certainly admitted in its general sense. But we need not pause to distinguish its application in the cases to special equipment as distinguished from common equipment, or how much the decisions were based upon the belief of the shipper, justified or encouraged by the railroads, that the equipment required would be furnished.

With the second proposition we are concerned, and a consideration of the cases becomes necessary as they are cases in this court and are cited to sustain the power of the Commission. They are as follows: *Chicago, Rock Island & Pacific Ry. Co.* v. *Hardwick Elevator Co.*, 226 U. S. 426; *Ellis* v. *Interstate Commerce Commission*, 237 U. S. 434; *Yazoo, &c. R. R. Co.* v. *Greenwood Grocery Co.*, 227 U. S. 1; *Missouri, Kansas & Texas Ry. Co.* v. *Harris*, 234 U. S. 412; *Menasha Paper Co.* v. *Chicago & N. W. Ry. Co.*, 241 U. S. 55.

The *Hardwick Elevator Case* passed upon a law of Minnesota, known as the Minnesota Reciprocal Demurrage Law, which made it the duty of a railroad company on demand from a shipper to furnish cars for transportation at terminal points within 48 hours and at intermediate points within 72 hours after such demand, Sundays and legal holidays excepted. A penalty was imposed for each day's delay. This court held that by § 1 of the Hepburn Act Congress had legislated concerning the delivery of cars in interstate commerce by carriers subject to the act. This was based upon the definitions of § 1 and the provisions of §§ 8 and 9. The questions in the case were not those in the present case. The kinds of equipment were not involved nor the questions dependent upon them. The only question was as to whether Congress had entered the field of regulation.

In *Yazoo &c. R. R. Co.* v. *Greenwood Grocery Company* there was also involved a statute which penalized delays in delivering cars. It was held to be within the decision of the *Hardwick Elevator Case,* as it undoubtedly was.

In the *Harris Case,* the Carmack Amendment was decided as not excluding a state statute allowing an attorney's fee in certain actions based on claims for small amounts against railway companies. It has no relevancy to the present case.

The *Ellis Case* grew out of a right asserted by the Interstate Commerce Commission to inquire whether Armour & Company, shipping packing house products in commerce among the States, was controlling the Armour Car Lines and using them as a device to obtain concessions from the published rates for transportation. A series of questions were put to a witness in regard thereto which he refused to answer, and proceedings to compel his testimony were instituted. A question of the power of the Commission was presented and that was made to depend upon whether the Armour Car Lines was a com-

mon carrier subject to the Interstate Commerce Act. It was replied that the Car Lines Company had no control over the motive power and movement of the cars and was not a common carrier subject to the act. And this was said: "It is true that the definition of transportation in § 1 of the act includes such instrumentalities as the Armour Car Lines lets to the railroads. But the definition is a preliminary to a requirement that the carriers shall furnish them upon reasonable request, not that the owners and builders shall be regarded as carriers, contrary to the truth." The language was perfectly apposite to the question under consideration, the relation of the Armour Car Lines to the Armour Company and to the railroad. The cars the latter obtained from the Car Lines Company constituted the equipment of the railroad company and were, of course, subject to the provisions of the Interstate Commerce Act.

The question with which the present case is concerned was not presented to the court nor intended to be decided. The testimony sought by the Commission was to expose and prevent what were supposed to be discriminatory practices, and the right to require the testimony depended, it was the effect of the decision, upon the relation of the Armour Company to the Armour Car Lines through the railroad, and whether what was paid to the Armour Car Lines was in effect paid to the Armour Company and made a means of discrimination. This view was rejected and it was said: "It does not matter to the responsibility of the roads whether they own or simply control the facilities, or whether they pay a greater or less price to their lessor" —the lessor of that case being the Armour Car Lines; and, as it was not shown that it was merely the tool of the Armour Company, it had immunity from the investigation. The case, therefore, is not authority for the proposition which it is urged to support.

*Menasha Paper Co.* v. *Chicago & N. W. Ry. Co.*, needs

no comment. It quotes but attempts no explanation of the words of the statute that is relevant to our present inquiry. Indeed, in all of the cases the points of inquiry and decision were different from the case at bar. They declared or enforced or recognized the general duty of carriers under the particular facts and the law to which the carriers were subject.

It is next contended by the United States that the railroad has held itself out specifically to carry oil in tank cars, and the fact, it is said, has been found by the Commission and is not reviewable, citing *United States* v. *Louisville & Nashville R. R. Co.*, 235 U. S. 314, 320. We are unable to assent.

The railroad company in its answer to the petition before the Interstate Commerce Commission alleged that Rule 29 of the official classification No. 39 providing rates for articles in tank cars stated that the carriers whose tariffs were covered by such classification did not assume any obligation to furnish tank cars. There is a concession in the brief of the Interstate Commerce Commission that such was the published tariff, though contesting its efficacy to divest the company of its duty as a carrier. This might be if there was a duty; but the United States seeks to establish the duty from the offer of the company and must take the offer as made and cannot, nor can the Commission, ignore its explicit qualification that the company assumed no obligation to furnish tank cars. The finding of the Commission, therefore, was one of law and not of fact, and is reviewable.

The railroad company, besides the contentions of want of power in the Commission to make the order under review, objects to it (1) in that it is defective because it requires the company to supply cars for movement over the lines of other carriers; and (2) that it is not administrative in character, but is uncertain, indefinite and unlawful.

In support of the first contention the railroad company points out that the company owns more tank cars than all of the other carriers east of the Mississippi River, amounting at the time of the hearing to 499 cars. The total ownership of other cars east of the Mississippi River amounted to 303, and the privately owned tank cars to 27,700. It therefore appears, it is said, that the railroad ownership is less than 3% of the total ownership and that of this 3% the company is furnishing more than half. The company, therefore, asserts that if it be compelled to furnish all of the tank cars required for the transportation of oil on its line irrespective of their destination, it is obvious that a burden out of all proportion is placed upon it. It further complains that although the New York Central Railroad serves the oil companies equally with it, no order is made against that company but, on the contrary, the entire burden is devolved upon it.

In support of the second contention the company asserts that the order of the Commission is not administrative is indicated by decisions of this court in actions for failure to furnish cars. The cases are: *Louisville & Nashville R. R. Co.* v. *Cook Brewing Co.*, 223 U. S. 70 (1912); *Eastern Ry. Co.* v. *Littlefield*, 237 U. S. 140 (1915); *Penna. R. R. Co.* v. *Puritan Coal Mining Co.*, 237 U. S. 121 (1915); *Illinois Central R. R. Co.* v. *Mulberry Hill Coal Co.*, 238 U. S. 275 (1915).

Again, it is charged that the order expressed but a legislative principle, has the generality of such principle without any criterion of application. The order requires the company to "provide . . . upon reasonable request and reasonable notice, at complainants' respective refineries, tank cars in sufficient number to transport said complainants' normal shipments in interstate commerce." What is a reasonable request or reasonable notice, and what are normal shipments? The order affords no answer and if the railroad company ventures, however honestly,

any resistance to a request or notice not deemed reasonable or to shipments not deemed normal it must exercise this right at the risk of a penalty of $5,000 a day against all of its responsible officers and agents. These considerations are very serious (*International Harvester Co.* v. *Kentucky*, 234 U. S. 216; *Collins* v. *Kentucky*, 234 U. S. 634), but the view we have taken of the power of the Commission to make the order, however definite and circumscribed it might have been made, renders it unnecessary to pass upon the contentions.

*Decree affirmed.*