**ATCHISON, T. & S. F. R. CO. et al. v. STATE.**

No. 12168—Opinion Filed Feb. 14, 1922.

Rehearing Denied April 18, 1922.

(Syllabus.)

1. **Carriers—Rates for Moving Circuses and Carnival Companies—Powers of Corporation Commission.**

Article 9 of the Constitution of this state confers power upon the Corporation Commission, where railway companies enter into contracts with the owners of circuses, shows, and carnival companies to move their cars and equipment, including persons in their employ, from one point to another, wholly within this state, to fix the rates to be charged by said railway companies in order to prevent extortion and unfair discrimination, and to promulgate rules regulating such services.

2. **Same—Reasonableness of Commission Orders.**

Record examined, and held, that the orders of the Corporation Commission complained of in the instant case are reasonable.

Appeal from Corporation Commission. From orders of Corporation Commission fixing rates for circuses and carnival movements, the Atchison, Topeka & Santa Fe Railway Company and other carriers appeal. Affirmed.

C. O. Blake, Cottingham, Hayes, Green & McInnis. Kleinschmidt & Grant, M. D. Green, Thos. B. Pryor, H. P. Warner, E. A. Boyd, O. E. Swan, and M. D. Libby, for plaintiffs in error.

S. P. Freeling, Atty. Gen., for the State.

Henshaw & Hough, for Rice-Gorman Shows.

JOHNSON, J. This is an appeal from the Corporation Commission, from orders No. 1784 and No. 1815, in cause No. 4025, fixing the rates to be charged by the railway companies of Oklahoma for services performed in circus and carnival movements over their lines of road in Oklahoma, which orders were the result of a general hearing and investigation ordered by the commission August 23, 1920. This general investigation grew out of complaints filed by the Rice-Gorman Shows, and former complaints by the Fair Association filed with the commission.

The record discloses that prior to federal control of railroads the shows were transported by all carriers by freight trains on contracts exempting the carriers from liability for any damage resulting to the equipment or the contents, including trained, tamed, or wild animals and all employes. The carriers charged slightly different rates in different sections of the country, ranging from $2 to $3 per train mile, with an average of approximately $2.50 per train mile. The carriers were left free to suggest these rates, which were presumed to be based upon the cost of transportation and a reasonable profit for handling the same, which had the effect of encouraging and increasing the passenger receipts and bringing the various communities together upon their respective lines, resulting in the development of business for the carriers. After the operation of the roads was taken over by the federal government the inducement for maintaining the original rules was absent, conditions being changed, and the carriers at that particular time enjoyed an abnormal business because of the war; hence, those in charge of operating the roads in different sections were making different rates, until the federal administration held a conference with a number of the principal showmen and operating officials of the carriers and promulgated a general order fixing the rates to be charged, and filed the same with the Interstate Commerce Commission, and rates were promulgated under Freight Authority No. 1508, which provided for the cancellation of all freight rates then filed with the Interstate Commerce Commission or State Commission, providing a permanent or continuous basis for charges for handling circuses or other show outfits by special train service.

The rates applicable in Oklahoma prior to July, 1915, to April, 1918, on the 25 car show were $2.25 per train mile, minimum charge $250; on a 30 car show, $3 per train mile, minimum $300; and from January 25, 1918, to March 13, 1919, the rates applicable on a 25 car show were $2.8125 per train mile, minimum $312.50; on a 30 car show, $3.75 per train mile, minimum $375. The administration rates were in effect from March 4, 1919. to March 25, 1920, which makes the minimum rate of a 50 mile haul, on a 25 car show $290, and for a 100 mile haul, $400; on a 30 car show, a minimum rate for a 50 mile haul, $320, and for a hundred mile haul, $460. The administration rates were increased 35 per cent. during the month of August, 1920, by the Interstate Commerce Commission, which made a minimum rate for a 50 mile haul on a 25 car show of $390, and for a 100 mile haul, $587. and on a 30 car show a minimum rate for a 50 mile haul of $432, and for a 100 mile haul, $621. After the roads were returned to private ownership, the Missouri, Kansas & Texas Railway established a rate of $8.10 per train mile, minimum charge $810, for a 25 or 30 car show. The defendant St. Louis & San Francisco Railway Company established a rate of $6.50 per train mile, with a minimum charge of $650, and the Chicago, Rock Island & Pacific Railway Company charged whatever its operating officials saw proper to charge at the time application was made for a contract, and its rates carried during the season from same service under the same or similar conditions.

The showmen transport what are known as fair shows, and which exhibit at fairs or under the auspices of some organization, such as the American Legion of Honor. There is demand for these shows at practically every county fair in each state, as well as all state fairs. The fairs have been built up and established by reason of the ability of the management to secure this class of fair shows. Without these shows the county fairs could not exist and state fairs would probably be a failure. The shows involved in this case have become, and are, a public necessity to the same extent

that county and state fairs and other legitimate amusements are a public necessity.

As a result of the increased rates of some of the carriers in the latter part of the season in 1920, many of these shows quit business and others sold out because of the uncertainty and unreasonableness of the rates. For many years the shippers of shows have hoped and sought to secure a uniform rate which would apply throughout a given territory. The Director General of Railroads of the United States exercised his authority under the war power—he canceled all state and interstate rates applicable to the movement of shows in special trains and established a uniform rate in each classification territory, which was in effect on the 29th day of February, 1920, and the date when the federal operation ceased, and practically all of the carriers in the Western classification territory, which includes Oklahoma, are charging the administration rate, plus 35 per cent., except the Frisco, Katy, and Rock Island and two or three other carriers in the Southwest.

The show business was built upon rates voluntarily made by the carriers throughout the United States for a period of more than 25 years. Large investments have been made in show property. More than 80 shows, not including such shows as Ringling Bros., but only fair shows, consist of about 2,000 privately owned cars, together with the show equipment, of the value of more than $5,000,000. The carriers have been holding themselves out and carrying, and for the purpose of the carrying shows, and fairs and other organizations have depended upon these shows for amusement for more than 25 years.

It is only proper that this class of business shall stand a proportion of the increase in rates as a result of the changed conditions brought about by the war. The rates promulgated by the Director General increased the rates of the defendants on a 25 car show 86.6 per cent., and on a 30 car show 53.3 per cent., with 35 per cent. increase added, which makes a raise in the rate prior to the war of 152 per cent. on a 25 car show and 107 per cent. on a 30 car show. The rate sought to be charged by the Missouri, Kansas & Texas Railway increased the rates in force prior to the Director General's raise for a 25 car show 260 per cent., and for a 30 car show 170 per cent. The general increase as applied to all business, was first 25 per cent., and, second, 35 per cent., making the total general increase of approximately 66 per cent.

The moving of shows differs from the movement of other freight in that in the movement of other freight an empty car must be set for loading in a team track or an industrial track. After the same is loaded another switch must be made to carry this car to an assembling point, where it is put in the train. At destination the train is carried in by the road crew, and they step off of their engine and out of the caboose and a switch crew takes the train and each car must be switched to some unloading track or some industrial track in different parts of the city, and if the industrial track is not on the line of the carrier, bring the car in, which costs the carrier $2 to have it shipped to an industrial track on another carrier's line; hence, for a 25 car train there must be from 75 to 100 different switch movements to collect and deliver the loads in the car; besides, one-third of the cars in a regular train on an average are empties, and the cars must be kept up and maintained by the carrier; while, on the other hand, the shows all move in a solid train, all the cars are owned by the shippers and are maintained without a dollar's expense to the carrier, and the switching service rendered ranges from an hour to one hour and 30 minutes at each stop, when the cars are set out on unused tracks, and the carrier receives $1 per day for the use of these tracks for each car, or for a 25 car show $25 per day. This class of shows remain at the various fairs for one week, and in addition to the rate the carriers will charge and collect from $125 to $150 as track rental, whereas their empty cars while setting on the track pay nothing.

The commission, after a full hearing accorded both the show people and the railway companies, made an exhaustive finding of facts and stated its conclusions as follows:

"The commission therefore finds that the rates now being charged by some of the lines operating within the state of Oklahoma, as compared with other lines so operating, are discriminatory and unreasonable, and that a uniform rate and charge is necessary to be established upon the business of handling shows, carnivals, and circuses, and that the rate and charge now effective upon other lines operating within the state, to wit, the rate and charge as fixed by the Director General under federal management with certain minor modifications plus 35 per cent. increase so made by the Interstate Commerce Commission and by this commission, is not an unreasonable charge and is fair to both the railway companies and to the shows, carnivals, and circuses."

The rates fixed by the Director General which were adopted by order of the commission as shown in table "A" thereof, which is a schedule of rates upon a movement of from six to ten cars graduated up to from 91 to 100 cars and covering in the first instance a movement of not over 50 miles to 200 miles, at a charge of, in the first instance, $243 per movement of a train from six to ten cars, to a charge of $810 for that distance, of not over 50 miles of a train of from 91 to 100 cars, to a distance of 200 miles, which shows on the average a compensation of from $2.835 per car per train mile of a train of from six to ten cars to $8.606 per car per train mile of a train of 91 to 100 cars, with a compensation for dead-head or home runs rate per mile, minimum 100 miles, $2.295 to $6.885, also allowing a 35 per cent. increase allowed on similar interstate traffic by the Interstate Commerce Commission and it was ordered that in the application of these rates, certain rules prescribed by the commission were to be observed. These rules were numbered from 1 to 13, inclusive, and provide for additional charges for additional services, to wit: Rule 1 provides that when flat cars are furnished, an additional charge of 15 cents per car mile, and when passenger coaches, an additional charge of 20 cents per coach mile. Rule 9 provides that if the show company desires any changes made in the dates or towns for which they have contracted with the railroad, a charge of $30 may be made by the railroad for each amendment to the contract. Rule 11 provides for additional charges of a rental of $1 per car per day or fraction thereof on all cars remaining at an exhibition point longer than 48 hours following the first 7 a. m. after arrival, Sundays excluded, such charge to be assessed regardless of the length of time the show remains at any one point. Rule 12 provides for switching compensation received from connecting lines for unloading or switching loaded outfits for delivery to connecting lines, etc., $3 per car, with a minimum charge of $30 per outfit.

Counsel for plaintiffs in error have made numerous assignments of error, which they have condensed into six specifications, which are as follows:

"1. The Corporation Commission was not authorized to make said orders.

"2. The orders of the Corporation Commission are repugnant to the Constitution of the United States, in that their purpose and effect is to impair the right of freedom to contract and they seek the taking of plaintiffs in error's property without due process of law and without compensation.

"3. Said orders are repugnant to the Constitution of the state of Oklahoma, in that their purpose and effect is to impair the right of freedom to contract, and they seek the taking of plaintiffs in error's property without due process of law and without compensation.

"4. Said orders are in excess of the powers delegated to the Corporation Commission, and have for their purpose the taking of private property for private use, in violation of section 31 of article 2 of the Constitution of the state of Oklahoma.

"5. Said orders are unconstitutional for repugnancy to the constitutional provisions, and because the rates provided are insufficient to afford reasonable compensation for the services rendered."

Concerning these specifications of error counsel for plaintiffs in error say in their brief:

"The specifications are so numerous that, for the sake of brevity, we shall discuss them together."

"The Corporation Commission was not authorized to make such orders. The Corporation Commission has no power other than that conferred by the Constitution and by subsequent legislation. The only grant of power under which it can be claimed that the Corporation Commission was authorized to enact and promulgate the orders complained of, is that contained in section 18 of article 9 of the Constitution, which confers authority to supervise, regulate, and control in matters relating to the public duties of carriers. A., T. & S. F. Ry. Co. v. Corporation Commission, 68 Oklahoma, 170 Pac. 1156. As we shall hereinafter show, the appellants were under no public duty to transport circuses, shows, carnivals, etc., as such. That is, while they were common carriers of substantially all of the units going to make up a completed circus, carnival, or show, they had never become common carriers of the aggregate of such units.

"The power to create or impose a duty which has not previously existed, is legislative, and its exercise is legislative, and the legislative authority of the state not reserved by the people to be exercised under the initiative and referendum, was conferred upon the legislative branch and withheld from the Corporation Commission. Such powers as it is authorized to exercise and which are legislative in character are merely incidental to other powers which have been conferred upon it. It was given no power to create new and additional servitudes and thereby confer additional powers upon itself or its members to enforce, super-

vise, or control compliance with such additional duties so created. The creation of duties is a legislative function. The regulation of the performance of such duties is an executive or ministerial function, in aid of which the judicial function may be put into operation. C., R. I. & P. Ry. Co. v. Lawton Refining Co., 253 Fed. 705; United States v. Penn. R. R. Co., 242 U. S. 237; L. & N. R. R. Co. v. Cook Brewing Co., 223 U. S. 70; Eastern Ry. Co. v. Littlefield, 237 U. S. 140; Penn. R. R. Co. v. Puritan Coal Min. Co., 237 U. S. 121; Illinois Central R. R. Co. v. Mulberry Hill Coal Co., 238 U. S. 275."

This appeal presents two questions for our determination: First, the authority of the commission to prescribe the rate; and, second, whether the rates prescribed by the commission are reasonable.

Section 6, art. 9, of the Constitution of Oklahoma is as follows:

"Railroads heretofore constructed, or which may hereinafter be constructed in this state, are hereby declared public highways."

Section 18, art. 9, of the Constitution in part is as follows:

"The commission shall have the power and authority and be charged with the duty of supervising, regulating and controlling all transportation and transmission companies doing business in this state, in all matters relating to the performance of their public duties and their charges therefor, and of correcting abuses and preventing unjust discrimination and extortion by such companies; and to that end the commission shall, from time to time, prescribe and enforce against such companies, in the manner hereinafter authorized, such rates, charges, classifications of traffic and rules and regulations, and shall require them to establish and maintain all such public service, facilities, and conveniences as may be reasonable and just, which said rates, charges, classification, rules, regulations, and requirements the commission may from time to time, alter or amend, * * * and shall from time to time make and enforce such requirements, rules and regulations as may be necessary to prevent unjust or unreasonable discrimination and extortion by any transportation or transmission company in favor of, or against any person, locality, community, connecting line or kind of traffic in the matter of car service, train or boat schedule, efficiency of transportation, transmission, or otherwise, in connection with the public duties of such company. * * * The authority of the commission (subject to review on appeal as hereinafter provided) to prescribe rates, charges, and classification of traffic, for transportation and transmission companies, shall, subject to regulation by law, be paramount, but its authority to pre-

scribe any other rules, regulations or requirements for corporations or other persons shall be subject to the superior authority of the Legislature to legislate thereon by general laws."

Section 22 of art. 9 provides that on an appeal from the action of the commission to this court "the action of the commission appealed from should be regarded as prima facie just, reasonable, and correct." Ft. Smith & W. Ry. Co. et al. v. State, 25 Okla. 866, 108 Pac. 407.

Counsel for plaintiffs in error cite in support of their contention the case of A., T. & S. F. Ry. Co. v. Corp. Com., 68 Oklahoma, 170 Pac. 1156. We do not think the case is in point. The rule there announced was that "the Corporation Commission has no jurisdiction or authority to require the performance by railway companies of public duties which have no bearing on, or relation to, the transportation of either persons or property, or which do not relate in any way to the transaction of business by the public with such railway companies." The instant case does not come within the rule therein announced, because the question here involved, we think, has a decided bearing and relation to the transportation of both persons and property and to the transaction of business by the public with such railway companies. It is true that counsel insist that the rates fixed by the commission in the orders complained of were for a special service and one that did not affect the public. We cannot agree with counsel in that contention. We fail to grasp the force of the argument that it was such a service that the railroad companies did not invite or hold themselves out to do, when it it clearly disclosed by the record that they were performing the service and charging therefor what the commission found to be an unreasonable and exorbitant rate, and had been so engaged for a number of years, and that they had been making contracts through their agents covering such service and performing the same. Hence, we say there was not only a holding out on their part to do such service, but that they had actually been doing the same.

We have examined the federal cases cited by counsel, supra, and will only quote from one of them, that of United States and Interstate Commerce Commission v. Penn. Ry. Co., 242 U. S. 208, where, in syllabus par. 1, the court said:

"The powers conferred on the Interstate Commerce Commission by the Act to Regulate Commerce, as amended (Acts of Feb-

ruary 4, 1887, 24 Stat. 379; March 2, 1889, 25 Stat. 855; June 29, 1906, 34 Stat. 584; and June 18, 1910, 36 Stat. 539), do not include the power to require carriers to provide and furnish oil tank cars—no question of discrimination being involved."

It is clear that the question there was a construction of the federal statute creating the Interstate Commerce Commission and defining its powers; it being held that the same did not include the power to require carriers to provide and furnish oil tanks—no question of discrimination being involved.

The other cases cited were of similar import, and construed the same acts and related to the same subject-matter.

We think the argument of counsel, if it be true as stated, that the act of the commission was in a sense legislative, is not a valid objection.

In the case of St. Louis & San Francisco Ry. Co. v. Williams et al., 25 Okla. 662, 107 Pac. 428, this court said:

"The Corporation Commission, by virtue of the provisions of article 9 of the Constitution, is invested with extraordinary powers, being authorized to exercise not only legislative, but also executive, administrative, and judicial powers"

—which rule has been followed by this court ever since.

Counsel also contend that said orders were repugnant to the Constitution of the state of Oklahoma in that their purpose and effect are to impair the right of freedom to contract and they seek the taking of plaintiffs in error's property without due process of law, and said orders are in excess of the powers delegated to the Corporation. Commission, and have for their purpose the taking of private property for private use, in violation of section 31 of article 2 of the Constitution of the state of Oklahoma, and because the rates provided are insufficient to afford reasonable compensation for the services rendered.

The orders of the commission complained of do not prohibit the plaintiffs in error from contracting for the special service as heretofore made by the companies with the show and carnival companies and to limit their liability, and we think that the commission has the authority to prescribe the rates to be charged for such services in order to prevent extortion and discrimination. The rates were fixed by the commission upon a full hearing, when the evidence offered was more or less in conflict, and the commission fixed the rates that were fixed and put in force by the Director General of Railroads when the same were under federal control, plus the 35 per cent. increase allowed by the Interstate Commerce Commission, and the record discloses that such rates were in force on about 90 per cent. of the railroads throughout the country, and we think that the evidence before the commission tends strongly to support its findings. Moreover, such rate comes to us supported with the presumption accorded by the Constitution of being prima facie just, reasonable, and correct, and the same should not be disturbed on appeal. St. Louis & S. F. Ry. Co. v. Williams, supra.

We think the Corporation Commission had jurisdiction, and that its findings of fact as a basis for the rate fixed are supported by the evidence, and its actions in fixing the rate and prescribing the rules set forth in its orders should be affirmed, and it is so ordered.

All the Justices concur, except HARRISON, C. J., not participating.