United States Court of Appeals,

Eleventh Circuit.

No. 97-8207.

GEORGIA MANUFACTURED HOUSING ASSOCIATION, INC., Destiny Industries, Inc., et al., Plaintiffs-Appellees, Cross-Appellants,

v.

SPALDING COUNTY, GEORGIA, Martha W. McDaniel, et al., Defendants-Appellants, Cross-Appellees.

Aug. 6, 1998.

Appeals from the United States District Court for the Northern District of Georgia. (No. 3/94-CV-51-GET), G. Ernest Tidwell, Judge.

Before BLACK and BARKETT, Circuit Judges, and HENDERSON, Senior Circuit Judge.

BLACK, Circuit Judge:

Spalding County, Georgia (County), amended its Zoning Ordinance to require that manufactured homes be built with a 4:12 roof pitch to qualify for placement in most residential districts. The district court struck down the 4:12 requirement, holding that the 4:12 requirement violates equal protection, substantive due process, and the dormant Commerce Clause and that the 4:12 requirement is preempted by federal law. We reverse.

I. BACKGROUND

On January 4, 1994, Spalding County adopted the 4:12 requirement as part of an amendment to its Zoning Ordinance. The amendment established three classes of manufactured housing, two of which are relevant here. "Class A" manufactured homes are homes[1] that meet HUD standards

---

[1]Manufactured homes are sometimes referred to as "mobile homes."

for manufactured housing[2] and satisfy various additional criteria, including the following: the roof must have a pitch of at least 4:12 (measured as the ratio of the roof's rise to its horizontal run); the home must have a width greater than 16 feet; the roof must be finished with shingles common to residential construction; the exterior siding must be similar to common residential construction; the area underneath the home must be enclosed by a masonry curtain wall; and the wheels and other transportation apparatus must be removed.[3] "Class B" manufactured homes are homes that meet HUD standards but do not satisfy the additional criteria. The Zoning Ordinance permits placement of Class A homes in any residential district as a matter of right; Class B homes are allowed in residential districts only as exceptions. As a result of the Zoning Ordinance, most Class B homes are placed in planned manufactured home communities.[4]

Appellees brought this action against the County to challenge the amended Zoning Ordinance as it relates to manufactured housing. The district court struck down the 4:12 roof-pitch requirement and held a bench trial to determine damages.[5] The district court awarded $28,580 in

[2]Manufactured housing is regulated by the National Manufactured Housing Construction and Safety Standards Act of 1974, 42 U.S.C. §§ 5401-5426, pursuant to which the Department of Housing and Urban Development (HUD) promulgated regulations related to construction and safety. 24 C.F.R. §§ 3280.1-3280.904.

[3]The Zoning Ordinance lists three additional requirements for Class A manufactured homes: the homes must be installed in accordance with certain provisions of the Official Code of Georgia; the landings must comply with the requirements regarding size and composition listed in Section 1113 of the Standard Building Code of the Southern Building Code Congress International; and the homes must not be used as storage facilities.

[4]Planned manufactured home communities are sometimes referred to as "mobile home parks" or "trailer parks."

[5]Although Appellees challenged all provisions of the Zoning Ordinance relating to manufactured housing, the district court specifically limited its order to the 4:12 requirement. After declaring the 4:12 requirement unconstitutional, the district court entered a series of orders resolving various procedural issues. On appeal, we address only the initial order striking down

damages pursuant to 42 U.S.C. § 1983, and awarded $236,715.60 in attorneys' fees and $17,878.99 in expenses pursuant to 42 U.S.C. § 1988. After the district court issued its order, the County filed this appeal.[6]

## II. DISCUSSION

We review the district court's finding of fact for clear error; we review the district court's legal conclusions de novo. *Corn v. City of Lauderdale Lakes,* 997 F.2d 1369, 1373 (11th Cir.1993).

A. *Substantive Due Process and Equal Protection*

Appellees assert the 4:12 requirement violates their Fourteenth Amendment rights to substantive due process and equal protection. Because the 4:12 requirement does not target a protected class, the substantive due process and equal protection claims both turn on the rational basis test; specifically, the 4:12 requirement must be rationally related to a legitimate government purpose. *Restigouche, Inc. v. Town of Jupiter,* 59 F.3d 1208, 1214 & n. 6 (11th Cir.1995).

The rational basis test consists of a two-prong inquiry:

> The first step in determining whether legislation survives rational-basis scrutiny is identifying a legitimate government purpose-a goal-which the enacting government body *could* have been pursuing. The *actual* motivations of the enacting governmental body are entirely irrelevant....

the 4:12 requirement.

[6]Appellees filed a cross-appeal asserting, as an alternative basis for affirming the judgment of the district court, that the 4:12 requirement violates the Fair Housing Act, 42 U.S.C. §§ 3601-3631(FHA). Specifically, Appellees argue that the price increase resulting from the 4:12 requirement makes housing less affordable for two classes protected by the FHA: (1) families; and (2) African Americans. The district court rejected this argument. The district court found that the evidence presented by Appellees did not constitute a prima facie case of discrimination against families. The district court also found that the overwhelming number of manufactured housing residents in Spalding County are not African-American, demonstrating that the Zoning Ordinance did not target this protected group. We agree with the district court and find no merit to the arguments in Appellees' cross-appeal.

3

The second step of rational-basis scrutiny asks whether a rational basis exists for the enacting governmental body to believe that the legislation would further the hypothesized purpose. The proper inquiry is concerned with the *existence* of a conceivably rational basis, not whether that basis was actually considered by the legislative body. As long as reasons for the legislative classification may have been considered to be true, and the relationship between the classification and the goal is not so attenuated as to render the distinction arbitrary or irrational, the legislation survives rational-basis scrutiny.

*Haves v. City of Miami,* 52 F.3d 918, 921-22 (11th Cir.1995) (internal quotations and citations omitted); *see also, TRM, Inc. v. United States,* 52 F.3d 941, 945-46 (11th Cir.1995). The first prong of this test is satisfied because the County could have been pursuing the goal of "aesthetic compatibility," seeking to reduce friction between the appearance of site-built homes and manufactured homes by requiring manufactured homes to conform with standard characteristics of site-built homes, such as roof pitch and foundation. The goal of aesthetic compatibility is a legitimate government purpose. *Haves,* 52 F.3d at 923 (approving "aesthetic uniformity" as a legitimate rationale to support municipal zoning decisions).

The second prong of the rational basis test is also satisfied. The County rationally could have believed that the 4:12 requirement would advance the goal of aesthetic compatibility among houses in residential districts by setting a minimum roof pitch requirement for manufactured homes that conforms with the standard characteristics of site-built homes. Although the demarcation of 4:12 as the threshold of acceptability for the roof pitch of manufactured homes may seem no more appropriate than 3:12 or 5:12, the County has the discretion to select a minimum ratio to advance its goal of aesthetic compatibility. Reasonable minds may differ as to where the line should be drawn or whether a line should be drawn at all, but the discretion to resolve that disagreement lies

4

with the County, not the courts.[7] *Haves,* 52 F.3d at 923-24.  Accordingly, the 4:12 requirement does not violate Appellees' rights to substantive due process or equal protection.

B. *Commerce Clause*

The district court ruled that the 4:12 requirement violates the dormant Commerce Clause, concluding that the resulting burden on commerce clearly outweighs the putative benefit of aesthetic compatibility.  In reaching this result, the district court focused on the burden on commerce in general rather than examining the specific burden on interstate commerce.

The 4:12 requirement applies equally to in-state and out-of-state business interests and its effects on interstate commerce are incidental.  The 4:12 requirement therefore will withstand scrutiny under the dormant Commerce Clause "unless the burden imposed on [interstate] commerce is clearly excessive in relation to the putative local benefits."  *Pike v. Bruce Church, Inc.,* 397 U.S. 137, 142, 90 S.Ct. 844, 847, 25 L.Ed.2d 174 (1970).

The district court made two findings regarding the burden on interstate commerce:  (1) the 4:12 requirement has caused significant problems for manufacturers both within and outside of Georgia;  and (2) the 4:12 requirement increases costs for members of the industry and consumers of manufactured housing.  These findings alone do not demonstrate the kind of economic protectionism forbidden by the dormant Commerce Clause.  First, laws that impose the same burden on in-state and out-of-state business interest usually do not violate the Commerce Clause.  *See Minnesota v. Clover Leaf Creamery Co.,* 449 U.S. 456, 473, 101 S.Ct. 715, 728, 66 L.Ed.2d 659 (1981) (in holding that the burden posed on interstate commerce by a Minnesota statute was not

---

[7]The district court based its conclusion in large part on evidence that the 4:12 requirement does not actually advance the goal of aesthetic compatibility.  That inquiry imposes an inappropriately high level of scrutiny on the County's decisions.  *Haves,* 52 F.3d at 922-23.

5

clearly excessive, the Court focused on the fact that both in-state and out-of-state firms would be burdened equally: "there is no reason to suspect that the gainers will be Minnesota firms, or the losers out-of-state firms."). As the Supreme Court explained, "[t]he existence of major in-state interests adversely affected ... is a powerful safeguard against legislative abuse." *Id.* at 728 n. 17. Second, the resulting price increases of manufactured homes do not weigh heavily against the 4:12 requirement because price increases generally do not violate the dormant Commerce Clause. *See Exxon Corp. v. Governor of Md.,* 437 U.S. 117, 127-28, 98 S.Ct. 2207, 2215, 57 L.Ed.2d 91 (1978) (in upholding a Maryland statute prohibiting oil refiners from operating retail gas stations, the Court stated: "It may be true that the consuming public will be injured by the loss of the high-volume, low-priced stations operated by the independent refiners, but again that argument relates to the wisdom of the statute, not to its burden on commerce.").

Appellees also assert that the 4:12 requirement discriminates against out-of-state manufactured home producers because the entire manufactured housing market (both in-state and out-of-state) will suffer at the expense of the site-built home market, which, by its very nature, is local and therefore strictly in-state. The Fifth Circuit rejected a similar argument in addressing a zoning ordinance that confined all manufactured housing to planned manufactured home communities: "Plaintiffs have not demonstrated that whatever mode of housing is built in lieu of HUD-code manufactured homes, it will be provided by in-state suppliers." *Texas Manufactured Housing Ass'n, Inc. v. City of Nederland,* 101 F.3d 1095, 1104 (5th Cir.1996), *cert. denied,* --- U.S. ----, 117 S.Ct. 2497, 138 L.Ed.2d 1003 (1997). Similarly, Appellees have not proffered evidence that the 4:12 requirement will significantly aid the local site-built market at the expense of the manufactured housing market, and the district court did not make any such finding of fact.

The relevant burden on interstate commerce is negligible and is not clearly excessive in relation to the putative local benefits of the 4:12 requirement. Accordingly, the 4:12 requirement does not violate the dormant Commerce Clause.

C. *Preemption*

The district court ruled that the 4:12 requirement is preempted by the National Manufactured Housing Construction and Safety Standards Act of 1974, 42 U.S.C. §§ 5401-5426(Act), because the 4:12 requirement "interferes with the Act's construction and safety requirements and cannot be enforced without impairing the Federal government's superintendence of the manufactured home industry." Congress defined the preemptive effect of the Act as follows:

> Whenever a Federal manufactured home construction and safety standard established under this chapter is in effect, no State or political subdivision of a State shall have any authority either to establish, or to continue in effect, with respect to any manufactured home covered, any standard regarding construction or safety applicable to the same aspect of performance of such manufactured home which is not identical to the Federal manufactured home construction and safety standard.

42 U.S.C. § 5403(d). This Court has interpreted that subsection in the following manner:

> The language of the statute clearly precludes states and municipalities from imposing *construction and safety* standards upon mobile homes that differ in any respect from those developed by HUD. Thus, if the Lynn Haven ordinance conditioned mobile home entry into or sale in the town on compliance with the SSBC, thereby forcing manufacturers to meet construction and safety requirements other than HUD standards in order to do business in the City, the municipal act would be preempted.

*Scurlock v. City of Lynn Haven,* 858 F.2d 1521, 1524 (11th Cir.1988) (footnote and citation omitted). The district court appears to have relied in large part on the HUD regulations that interpret the preemptive effect of the Act. The HUD regulations provide:

> No State or locality may establish or enforce any rule or regulation or take any action that stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress. The test of whether a State rule or action is valid or must give way

7

is whether the State rule can be enforced or the action taken without impairing the Federal superintendence of the manufactured home industry as established by the Act.

24 C.F.R. § 3282.11(d). In *Scurlock,* a panel of this Court cited § 3282.11(d) as the overarching test for preemption. 858 F.2d at 1525.[8]

*Scurlock* held that the Act preempted a local ordinance that forbade placement of manufactured homes in residential districts unless the manufactured homes met certain safety codes or had the seal of the Florida Department of Community Affairs. *Id.* at 1522-23. Like the present case, manufactured homes could freely be placed in planned manufactured home communities. *Id.* at 1523. In considering the validity of that ordinance, the Court explained that the City has broad discretion in enacting zoning ordinances:

> The law is well-settled that governmental bodies like Lynn Haven "have the right to set minimum standards for housing in residentially-zoned districts." *Grant v. County of Seminole, Fla.,* 817 F.2d 731, 736 (11th Cir.1987). Municipalities may zone land to pursue any number of legitimate objectives related to the health, safety, morals, or general welfare of the community. See generally 1 R. Anderson, *American Law of Zoning 3d* §§ 7.01-7.03 (1986).

*Id.* at 1525. We concluded, however, that the City's ordinance sought to control land use through its safety code, and held that the ordinance was therefore preempted:

> The City is attempting to exclude the Scurlock's mobile home from its R-AA section based solely on its safety code. The City building inspector agreed that if the home met the

---

[8]We are bound by *Scurlock* 's approval of § 3282.11(d). *See Cargill v. Turpin,* 120 F.3d 1366, 1386 (11th Cir.1997) ("The law of the circuit is "emphatic' that only the Supreme Court or this court sitting *en banc* can judicially overrule a prior panel decision."), *cert. denied,* --- U.S. ----, 118 S.Ct. 1529, 140 L.Ed.2d 680 (1998). Nevertheless, we are not entirely convinced that the regulation is valid. The HUD regulation seems to expand the scope of the unambiguous preemption provision enacted by Congress. *Compare* 42 U.S.C. § 5403(d), *with* 24 C.F.R. § 3282.11(d); *see also Cipollone v. Liggett Group, Inc.,* 505 U.S. 504, 517, 112 S.Ct. 2608, 2618, 120 L.Ed.2d 407 (1992) ("Congress' enactment of a provision defining the pre-emptive reach of a statute implies that matters beyond that reach are not pre-empted.").

8

Southern Building Code requirement, a permit would be issued. Thus the City apparently wishes to apply its safety code to enforce land use.

*Id.*

After *Scurlock,* we must decide whether the 4:12 requirement is a "construction or safety standard" within the meaning of the Act, the enforcement of which would impair the federal superintendence of the manufactured home industry. In defining the preemptive scope of the Act, *Scurlock* detailed the Act's legislative history and the HUD regulations as follows:

> In considering the federal legislation and its impact upon the ordinance enacted by Lynn Haven, we must turn to the legislative history and the HUD regulations in order to resolve the federal preemption issue. According to Congress, the purposes of the Act "are to reduce the number of personal injuries and deaths and the amount of insurance costs and property damage resulting from [mobile] home accidents and to improve the quality and durability of [mobile] homes." 42 U.S.C. § 5401. The Act undoubtedly represents consumer safety legislation. *See* 1974 U.S.Code Cong. & Admin. News 4279, 4340. Under its provisions, manufacturers of mobile homes must notify purchasers about any construction or safety defects and correct many at no charge to the consumers. *See id.* § 5414(a), (g). If a manufacturer discovers a defect before the mobile home is purchased by the consumer, it must "immediately repurchase" the home from the dealer or provide for repairs. *Id.* § 5412(a). Moreover, HUD is authorized to release to the public information concerning construction and safety defects present in particular homes, *id.* § 5413(c)(5), and manufacturers must provide purchasers with manuals explaining the operation, maintenance, and repair requirements of their mobile homes, *id.* § 5416. Finally, the Act states that "[t]he rights afforded [mobile] home purchasers under this chapter may not be waived, and any provision of a contract ... to the contrary shall be void." *Id.* § 5421. However, while consumer protection represents the primary goal of the legislation, complete safety is not to be obtained at all expense: in promulgating regulations, HUD must "consider the effect of [the standards] on the cost of [mobile] home[s] to the public." *Id.* § 5403(f)(4).
>
> Pursuant to this congressional mandate HUD has developed standards covering "all equipment and installations in the design, construction, fire safety, plumbing, heat-producing and electrical systems of [mobile] homes." 24 C.F.R. § 3280.1(a). The HUD regulations seek to establish performance requirements, *see id.* § 3280.1(b), in order to protect the public against any unreasonable risk of death, injury, or the occurrence of accidents due to the design or construction of mobile homes, *see id.* § 3280.2(a)(18).

858 F.2d at 1524-25.

9

By defining the scope of the federal superintendence of the mobile home industry, *Scurlock* established that the construction and safety standards preempted by the Act are those standards that protect consumers from various potential hazards associated with manufactured housing. In contrast, a zoning requirement related to aesthetics is not be preempted because the goals and effects of such a standard have nothing to do with consumer protection, but instead seek to control the aesthetic quality of a municipality's neighborhoods.

The 4:12 requirement is not preempted because it is not a construction or safety standard within the meaning of the Act. Instead, the 4:12 requirement is an aesthetic condition for placement of manufactured homes in residential districts. Unlike the ordinance in *Scurlock,* the 4:12 requirement does not have any purported basis in consumer protection, but is a straight-forward declaration that the County does not want low-pitched roofs in its residential areas.[9]

Furthermore, the 4:12 requirement does not impede the HUD standards because it does not alter or excuse the requirements for HUD certification, but simply imposes an aesthetic condition

---

[9]This conclusion is supported by the district court's quotation of the County's comprehensive land use plan adopted on April 4, 1994:

> Unfortunately, uncontrolled development has led, in many instances, to incompatible land uses being located next to each other. Several of these instances involve the location of mobile homes in the County.
>
> ....
>
> In order to alleviate some of the friction caused by the development of mobile home sites and subdivisions, the County is in the process of adopting a new Unified Development Ordinance which will allow new mobile homes but requires that they conform with standard stick built home characteristics such as roof pitches and foundations.

for placement of manufactured homes in certain localities within the County.[10]  The preemptive scope of the Act is not so broad as to limit the County's authority to regulate aesthetics through its Zoning Ordinance.  *See Medtronic, Inc. v. Lohr,* 518 U.S. 470, 485, 116 S.Ct. 2240, 2250, 135 L.Ed.2d 700 (1996) (in performing preemption analysis, the Court explained that "we start with the assumption that the historic police powers of the States were not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress" (internal quotations and citations omitted)).  Accordingly, the 4:12 requirement is not preempted by the Act.

### III. CONCLUSION

The district court erred in declaring the 4:12 requirement invalid.  We reverse the district court's order, vacate the judgment, and remand for entry of judgment consistent with this opinion.

REVERSED, VACATED, and REMANDED.

---

[10]The district court found that the 4:12 requirement forces builders to construct homes with hinged roofs, i.e., roofs that are hinged to fold down during transportation.  Pursuant to this method of construction, ventilation and interior support mechanisms are not put in place until the home arrives at its destination and the roof is straightened.  Although HUD inspections normally occur at the construction site, hinge-roofed homes receive HUD inspection and approval after arriving at their destination through the issuance of an "alternate construction letter."  The 4:12 requirement does not excuse compliance with the HUD standards.  If it is impossible to satisfy both the HUD standards and the County's additional criteria, no manufactured homes will be designated Class A and, therefore, all manufactured homes will be excluded from residential zones.  *Scurlock* recognized that such a result is permissible:  "Undoubtedly [the City] could limit Zone R-AA to conventionally-built residences and exclude mobile homes."  858 F.2d at 1525.