[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

No. 00-14434

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
SEPT. 27, 2001
THOMAS K. KAHN
CLERK

D.C. Docket No. 00-08198-CV-DMM

FLORIDA EAST COAST RAILWAY COMPANY,
a Florida corporation,

Plaintiff-Counter-
Defendant-Appellant,

versus

CITY OF WEST PALM BEACH,
a Florida municipal corporation,

Defendant-Intervenor-
Defendant-Counter-
Claimant-Third-Party-
Plaintiff-Appellee.

Appeal from the United States District Court for the
Southern District of Florida

**(September 27, 2001)**

Before TJOFLAT and WILSON, Circuit Judges, and RESTANI[*], Judge.

RESTANI, Judge:

Appellant Florida East Coast Railway Company ("FEC") seeks reversal of the district court's final judgment denying declaratory and injunctive relief against appellee City of West Palm Beach ("West Palm Beach" or "the City"). FEC sought a determination from the district court that the Interstate Commerce Commission Termination Act ("ICCTA"), 49 U.S.C. § 701 et seq. (1994 and Supp. 1998), pre-empts the City's application of zoning and occupational license ordinances against the operations of Rinker Materials Corporation ("Rinker") on property leased from FEC. We hold that the application of the ordinances does not constitute "regulation of rail transportation," 49 U.S.C. § 10501(b), and therefore, is not pre-empted by the ICCTA.

## Jurisdiction

The district court had federal question jurisdiction over the complaint seeking declaratory relief pursuant to 28 U.S.C. § 2201(a) and 28 U.S.C. §§ 1331, 1337. Appellate jurisdiction is under 28 U.S.C. § 1291.

---

[*] Honorable Jane A. Restani, Judge of the United States Court of International Trade, sitting by designation.

2

**Facts**

FEC owns 24.5 acres of property on 15th Street ("15th Street yard") in West Palm Beach, in an area otherwise zoned by the City as a multi-family high density residential district. Situated on this property are an office building, warehouses, five switching tracks, and two loading/unloading tracks. Although FEC had used the 15th Street yard for various intermodal operations for several years, the company ceased those operations in 1999 because of "diminishing business activity and cost of systems enhancements . . . along with marginal revenue per unit."

At the time FEC altered the nature of operations at the 15th Street yard, Rinker was FEC's largest customer. Rinker is in the business of supplying building material including "aggregate," the primary feedstock for cement. Rinker's aggregate originates in quarries in Miami-Dade County. For years Rinker had engaged FEC to transport the aggregate by rail to Rinker plants throughout Florida, including one on 7th Street in West Palm Beach.

In March of 1999, FEC and Rinker began discussing the possibility of a like-kind property exchange, whereby FEC would exchange its 15th Street yard for Rinker's 7th Street plant. Rinker recognized, however, that the 15th Street yard was not properly zoned for its proposed aggregate distribution business. Michael

Bagley, head of real estate at FEC, suggested that "[p]rior to approaching the City, it [may be] wise to get Rinker established on a small scale, under lease arrangement to set precedent for continued use and expansion as an aggregate terminal." FEC and Rinker therefore negotiated a lease agreement and a trackage agreement whereby FEC would lease to Rinker twenty-one acres of the 15th Street yard (including the office building) and a side track. Additionally, FEC would no longer transport aggregate for Rinker to Rinker's plants throughout Florida; instead, FEC's rail services for Rinker would be limited to the transportation of the aggregate from the Miami-Dade quarries to the 15th Street yard. Operations under the new agreement commenced in January of 2000.

Once the aggregate entered the leased portion of the 15th Street yard, FEC's involvement ended. On the property leased from FEC, Rinker situated its aggregate distribution business, as evidenced by signs initially posted in the 15th Street yard that read "CSR Rinker -- West Palm Beach -- Aggregate Distribution." Sometime between February 14, 2000 and March 8, 2000, the signs were replaced with ones reading "FEC Distribution Terminal." Rinker hired a company to undertake the unloading of the aggregate but provided certain necessary equipment for the aggregate distribution, including a $79,300 truck-weighing scale and a $7000 loader bucket scale, or "backhoe." Then, Rinker

4

employees loaded trucks, which were owned or hired by Rinker, and dispatched them to other Rinker plants or to external customers. Rinker employees coordinated the distribution network from the office building leased from FEC, including receiving requests for aggregate from Rinker plants and communicating with the aggregate truck drivers. Finally, Rinker was responsible for payment of its expenses on electricity, water, landscape maintenance, and telephone service.

On February 17, 2000, West Palm Beach issued Cease and Desist Orders to FEC and Rinker for operating a business that did not conform to the City's pre-existing zoning ordinance. FEC and Rinker also received notice of violations of Section 18-7 of the City Ordinances for unlawfully operating a business without an occupational license. After a hearing in March of 2000, a special magistrate found FEC and Rinker in violation of the zoning and occupational license ordinances, and therefore ordered both companies to cease and desist or face fines of $1000 per day. FEC then filed its complaint seeking a declaratory judgment that West Palm Beach's actions were pre-empted by the ICCTA, and therefore, the City could not impose its zoning and occupational license requirements on Rinker's operations. West Palm Beach filed a counterclaim against FEC and a third-party claim against Rinker, seeking a declaratory judgment that the application of its local regulations was not pre-empted by federal law.

5

## Discussion

We review de novo the district court's legal conclusion as to the pre-emptive scope of the ICCTA; factual findings will be set aside only if clearly erroneous. See Ga. Manufactured Hous. Ass'n, Inc. v. Spalding County, 148 F.3d 1304, 1307 (11th Cir. 1998).

## Presumption Against Pre-emption

"Consideration under the Supremacy Clause starts with the basic assumption that Congress did not intend to displace state law." Bldg. & Constr. Trades Council v. Associated Builders & Contractors, 507 U.S. 218, 224 (1993) (quoting Maryland v. Louisiana, 451 U.S. 725, 746 (1981)). We recognize that "an 'assumption' of nonpre-emption is not triggered when the State regulates in an area where there has been a history of significant federal presence." United States v. Locke, 529 U.S. 89, 108 (2000) (state regulation of maritime commerce and employment). See also Ray v. Atlantic Richfield Co., 435 U.S. 151 (1978) (same). Where the State acts "in a field which the States have traditionally occupied," however, we retain the "assumption that the historic police powers of the States were not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress." Medtronic, Inc. v. Lohr, 518 U.S. 470, 485 (1996) (quoting

6

Rice v. Santa Fe Elevator Corp., 331 U.S. 218, 230 (1947)).  Principles of

federalism, including the recognition that "the States are independent sovereigns in

our federal system," Medtronic, 518 U.S. at 485, dictate that in the absence of such

clarity of intent, Congress cannot "be deemed to have significantly changed the

federal-state balance."  Jones v. United States, 529 U.S. 848, 860 (2000) (Stevens,

J., concurring) (quoting United States v. Bass, 404 U.S. 336, 349 (1971)).

Reliance on the presumption against pre-emption limits "congressional intrusion

into the States' traditional prerogatives and general authority to regulate for the

health and welfare of their citizens."  City of Boerne v. Flores, 521 U.S. 507, 534

(1997).[1]  Thus, "[i]f the statute's terms can be read sensibly not to have a pre-

---

[1]     Cf. Bethlehem Steel Co. v. New York State Labor Relations Bd., 330 U.S. 767,
779-80 (1947) (Frankfurter, J., concurring):

> When construing federal legislation that deals with matters that also lie within the
> authority, because within the proper interests, of the States, we must be mindful
> that we are part of the delicate process of adjusting the interacting areas of
> National and State authority over commerce.  The inevitable extension of federal
> authority over economic enterprise has absorbed the authority that was previously
> left to the States.  But in legislating, Congress is not indulging in doctrinaire,
> hard-and-fast curtailment of the State powers reflecting special State interests.
> Federal legislation of this character must be construed with due regard to
> accommodation between the assertions of new federal authority and the functions
> of the individual States, as reflecting the historic and persistent concerns of our
> dual system of government.  Since Congress can, if it chooses, entirely displace
> the States to the full extent of the far-reaching Commerce Clause, Congress needs
> no help from generous judicial implications to achieve the supersession of State
> authority. To construe federal legislation so as not needlessly to forbid preexisting
> State authority is to respect our federal system. Any indulgence in construction
> should be in favor of the States, because Congress can speak with drastic clarity
> whenever it chooses to assure full federal authority, completely displacing the

emptive effect, the presumption controls and no pre-emption may be inferred."

Gade v. Nat'l Solid Wastes Mgmt. Ass'n, 505 U.S. 88, 116-17 (1992) (Souter, J., dissenting).

The ordinances at issue in this case are entitled to this presumption of validity under the Supremacy Clause. Although the federal government through the ICCTA has legislated in "an area where there has been a history of significant federal presence,"[2] Locke, 529 U.S. at 108, West Palm Beach is not legislating in that field of historic federal dominance. Rather, in contrast to the situation highlighted by the Court in Locke, West Palm Beach is acting under the traditionally local police power of zoning and health and safety regulation. The Supreme Court has long recognized the authority of local governments to establish guidelines for the use of property through such zoning ordinances. See generally Village of Belle Terre v. Boraas, 416 U.S. 1 (1974); Village of Euclid v. Ambler

States.

[2] Although there has been a history of such federal presence in the area of railroad regulation, the virtual exclusivity of federal regulation is a recent phenomenon. See Fla. E. Coast Ry. v. City of West Palm Beach, 110 F. Supp. 2d 1367, 1373-74 (S.D. Fla. 2000) (discussing history of railroad regulation). In fact, the federal government shared jurisdiction over important elements of railroad regulation with the States until the passage of the ICCTA. Compare 49 U.S.C. §§ 10501(b)-(d) and 10907(b)(1) (1988) (pre-ICCTA statute providing for concurrent federal-state jurisdiction or exclusive state jurisdiction over certain aspects of rail regulation) with 49 U.S.C. § 10501(b) (1994 & Supp. 1998) (post-ICCTA statute providing for exclusive federal jurisdiction over regulation of rail transportation).

8

Realty Co., 272 U.S. 365 (1926). As we reiterated more recently, "[m]unicipalities may zone land to pursue any number of legitimate objectives related to the health, safety, morals, or general welfare of the community." Ga. Manufactured Hous. Ass'n, 148 F.3d at 1309 (quoting Scurlock v. City of Lynn Haven, 858 F.2d 1521, 1525 (11th Cir. 1988)). Because the alleged encroachment upon federal jurisdiction here does not occur by the municipality's legislating in a field of historic federal presence, but through the exercise of its inherently local powers, "[t]he principles of federalism and respect for state sovereignty that underlie the Court's reluctance to find pre-emption," Cipollone v. Liggett Group, Inc., 505 U.S. 504, 533 (1992) (Blackmun, J., concurring), place a "considerable burden" on appellant. De Buono v. NYSA-ILSA Med. & Clinical Servs. Fund, 520 U.S. 806, 814 (1997).

**Nonpre-emption of West Palm Beach Ordinances**

When evaluating the pre-emptive scope of a federal statute, we recall that "'[t]he purpose of Congress is the ultimate touchstone' in every pre-emption case." Medtronic, 518 U.S. at 485 (quoting Retail Clerks v. Schermerhorn, 375 U.S. 96, 103 (1963)). Where, as here, Congress has included a specific provision governing the pre-emptive effect of the legislation, we must "identify the domain expressly

9

pre-empted." Cipollone, 505 U.S. at 517. In doing so, we "begin with the language employed by Congress and the assumption that the ordinary meaning of that language accurately expresses the legislative purpose." Id. at 532 (Blackmun, J., concurring in part and dissenting in part) (citations and internal quotation marks omitted). We also examine the "'structure and purpose of the statute as a whole' . . . as revealed not only in the text, but through the reviewing court's reasoned understanding of the way in which Congress intended the statute and its surrounding regulatory scheme to affect business, consumers, and the law." Medtronic, 518 U.S. at 486 (quoting Gade, 505 U.S. at 98). In light of these general principles, the text, history, and purpose of the statute reveal that, because West Palm Beach's application of its ordinances does not constitute "regulation of rail transportation," 49 U.S.C. § 10501(b), the ICCTA does not pre-empt the City's actions.[3]

---

[3] FEC argues that the City's application of its zoning ordinance is pre-empted based on express pre-emption (pursuant to 49 U.S.C. § 10501(b)) and implied pre-emption (i.e., that the City's actions frustrate the objectives of federal railroad regulation established by Congress). We conclude that the City's actions do not fall within the statutory pre-emption provision. "Congress' enactment of a provision defining the pre-emptive reach of a statute implies that matters beyond that reach are not pre-empted." Cipollone, 505 U.S. at 517. Although such an "inference" does not necessarily foreclose the possibility of implied pre-emption, Freightliner Corp. v. Myrick, 514 U.S. 280, 289 (1995), our following evaluation of the context surrounding 49 U.S.C. § 10501(b) confirms that application of the City's zoning ordinance does not "'stand[] as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.'" Jones v. Roth Packing Co., 430 U.S. 519, 526 (1977) (quoting Hines v. Davidowitz, 312 U.S. 52, 67 (1941)).

10

## Express Limitations of ICCTA Pre-emption

The key provision of the ICCTA, as it relates to this case, is as follows:

(b) The jurisdiction of the [Surface Transportation] Board over —

    (1)    transportation by rail carriers, and the remedies provided in this part with respect to rates, classifications, rules (including car service, interchange, and other operating rules), practices, routes, services, and facilities of such carriers; and

    (2)    the construction, acquisition, operation, abandonment, or discontinuance of spur, industrial, team, switching, or side tracks, or facilities, even if the tracks are located, or intended to be located, entirely in one State,

is exclusive. Except as otherwise provided in this part, the remedies provided under this part with respect to regulation of rail transportation are exclusive and preempt the remedies provided under Federal or State law.

49 U.S.C. § 10501(b). Although this subsection on its surface seems to provide for broad pre-emption, the text contains limitations on the reach of pre-emption vis-à-vis local legislation such as West Palm Beach's zoning and occupational license ordinances.

First, the "State law" which is to be pre-empted is not defined. When Congress has sought to "underscore its intent that [the pre-emption provision] be expansively applied, [it has] used . . . broad language in defining the 'State law' that would be pre-empted," for example, by stating that such law included all

11

"'State action having the effect of law.'" Ingersoll-Rand Co. v. McClendon, 498 U.S. at 133, 138-39 (1990) (quoting ERISA § 514(c)(1), 29 U.S.C. § 1144(c)(1)). Second, the above-quoted provision limits pre-emption to "State law."[4] 49 U.S.C. § 10501(b) (emphasis added). In the context of railroad regulation, Congress has specifically identified when municipal law should be superseded by federal statute. See, e.g., 49 U.S.C. § 11321(a) ("A rail carrier, corporation, or person participating in that approved or exempted transaction is exempt from the antitrust laws and from all other law, including State and municipal law . . . ."). See also Norfolk & Western Ry. Co. v. Am. Train Dispatchers' Ass'n, 499 U.S. 117, 128-29 (1991) (discussing far-reaching coverage of § 11321(a), formerly § 11341(a), based on "clear, broad, and unqualified" language employed). By circumscribing the pre-emptive effect of the ICCTA to certain federal and state laws, Congress did not clearly include municipal laws such as West Palm Beach's zoning ordinances within the plain reach of federal pre-emption. "[C]ourts must presume that a legislature says in a statute what it means and means in a statute what it says there." Conn. Nat'l Bank v. Germain, 503 U.S. 249, 253-54 (1992) (citations omitted). See also Gutierrez v. Ada, 528 U.S. 250, 255-56 (2000) (unanimous

---

[4]     The ICCTA defines "State" as "a State of the United States and the District of Columbia." 49 U.S.C. § 10102(8).

opinion). Nevertheless, some municipal laws that would have the effect of burdensome state law may be pre-empted under the ICCTA, but because municipal law is not expressly pre-empted, its effects must be closely examined.

The ICCTA pre-emption provision does not preclude the application of "all other law." Cf. 49 U.S.C. § 11341(a) (with regard to mergers and acquisitions, railroad companies exempt from "antitrust laws and from all other law, including State and municipal law"). Rather, express pre-emption applies only to state laws "with respect to regulation of rail transportation." 49 U.S.C. § 10501(b) (emphasis added). This necessarily means something qualitatively different from laws "with respect to rail transportation." See Bennett v. Spear, 520 U.S. 154, 173 (1997) (relying on "'cardinal principle of statutory construction' [that courts must] 'give effect, if possible, to every clause and word of a statute.'") (citations omitted). In this manner, Congress narrowly tailored the ICCTA pre-emption provision to displace only "regulation," i.e., those state laws that may reasonably be said to have the effect of "manag[ing]" or "govern[ing]" rail transportation, Black's Law Dictionary 1286 (6th ed. 1990), while permitting the continued application of laws having a more remote or incidental effect on rail transportation. See Cal. Div. of Labor Standards & Enforcement v. Dillingham Constr. N.A., 519 U.S. 316, 334 (1997) ("The prevailing wage statute alters the incentives, but does not dictate the

13

choices, facing ERISA plans.  In this regard, it is 'no different from myriad state laws in areas traditionally subject to local regulation, which Congress could not possibly have intended to eliminate.'") (quoting N.Y. State Conf. of Blue Cross & Blue Shield Plans v. Travelers Ins. Co., 514 U.S. 645, 655 (1995)).  See also Lorillard Tobacco Co. v. Reilly, No. 00-596, 121 S. Ct. 2404, 2417 (June 28, 2001) (majority opinion) (finding express pre-emption where "there is no question about an indirect relationship between the regulations and cigarette advertising because the regulations expressly target cigarette advertising"); Bldg. & Constr. Trades Council v. Associated Builders & Contractors, 507 U.S. 218, 227 (1993) ("We have held consistently that the NLRA was intended to supplant state labor regulation, not all legitimate state activity that affects labor.") (emphasis in original).

In light of the above understanding of the statutory pre-emption provision in the ICCTA, existing zoning ordinances of general applicability, which are enforced against a private entity leasing property from a railroad for non-rail transportation purposes, are not sufficiently linked to rules governing the operation of the railroad so as to constitute laws "with respect to regulation of rail transportation."  Cf. Lorillard, 121 S. Ct. at 2419 (majority opinion) ("There is a critical distinction, however, between generally applicable zoning regulations . . . and regulations

targeting cigarette advertising."). See also id. at 2420. Both parties agree that the City does not impose its generally applicable zoning ordinances against FEC, thereby preventing FEC from operating in the otherwise residential neighborhood.[5] Cf. City of Auburn v. United States, 154 F.3d 1025, 1029-31 (9th Cir. 1998) (finding local environmental regulation applied against railroad to be pre-empted by ICCTA), cert. denied, 527 U.S. 1022 (1999); Soo Line R.R. Co. v. City of Minneapolis, 38 F. Supp. 2d 1096, 1098-1101 (D. Minn. 1998) (finding city's process of requiring railroad to obtain demolition permits pre-empted by ICCTA). We are not called upon to decide whether federal law would constrain the City's exercise of its police power to limit FEC's operations should it engage in an aggregate distribution business in exactly the same manner as Rinker. It is clear, however, that in no way does federal pre-emption under the ICCTA mandate that municipalities allow any private entity to operate in a residentially zoned area simply because the entity is under a lease from the railroad. The language of the

---

[5] The STB's recent decision in Joint Petition for Declaratory Order — Boston and Maine Corp. and Town of Ayer, Mass., STB Fin. Docket No. 33971, 2001 WL 458685 (STB Apr. 30, 2001), relied upon by FEC in its supplemental filing, is therefore inapposite. The local government in Boston and Maine sought to restrict a rail carrier's construction of an automobile unloading facility because of environmental concerns. See id. at *1-2. The STB recognized as much when it stated that "state and local permitting or preclearance requirements . . . are preempted because by their nature they unduly interfere with interstate commerce by giving the local body the ability to deny the carrier the right to construct facilities or conduct operations." Id. at *5 (emphasis added) (citation omitted).

15

ICCTA pre-emption provision in no way suggests that local regulation was to be so thoroughly disabled.

## Definition of "Transportation"

Because the ICCTA defines "transportation" to include "facilit[ies] . . . related to the movement of . . . property . . . by rail, regardless of ownership or an agreement concerning use," 49 U.S.C. § 10102(9)(A) (1994 & Supp. 1998),[6] FEC urges that whether the activities that take place at the 15th Street yard are performed by FEC or some other entity should have no bearing on our pre-emption analysis. As a preliminary matter, we note that the statute ignores "ownership or agreement concerning use" solely with respect to any "facility, instrumentality, or equipment of any kind related to the movement of . . . property." Id. In contrast, the statute imposes no such limitation on "services related to [the movement of

_____

[6]    The full definition of "transportation" under the ICCTA is as follows:

(A)    a locomotive, car, vehicle, vessel, warehouse, wharf, pier, dock, yard, property, facility, instrumentality, or equipment of any kind related to the movement of passengers or property, or both, by rail, regardless of ownership or an agreement concerning use; and

(B)    services related to that movement, including receipt, delivery, elevation, transfer in transit, refrigeration, icing, ventilation, storage, handling, and interchange of passengers and property . . . .

49 U.S.C. § 10102(9) (1994 & Supp. 1998).

16

property." § 10102(9)(B) (emphasis added). Therefore, to the extent that the language relied upon by FEC prevents us from interpreting the scope of the pre-emption provision based on whether FEC or Rinker controls the property at the 15th Street yard, the statutory definition of "transportation" does not prohibit our relying upon such a distinction when evaluating the "services" performed at the property.

Our review of the record indicates that we are, indeed, evaluating "services" performed at the property. When the aggregate reached the 15th Street yard, it was unloaded, stockpiled on the ground, organized by type and grade, and reloaded onto trucks owned or hired by Rinker. Rinker employees then weighed and dispatched the trucks to various destinations. These activities fall under the "services" provision of the statutory definition of "transportation," as Rinker's activities involved the "receipt, . . . storage, handling, and interchange of . . . property . . . ." 49 U.S.C. § 10102(9). Thus, the statutory language indicates that ownership or control of the property is a factor that we may consider in determining whether Rinker's activities are "rail transportation," and in ultimately deciding whether federal law pre-empts the City's zoning regulations in this case.

In addition to the statutory language, an analysis of the phrase "regardless of ownership or an agreement concerning use" in its historical context also supports

17

the conclusion that the provision cannot bear the broad interpretation urged by FEC. The phrase originated in language found in the Hepburn Act of 1906, which amended significantly the Interstate Commerce Act of 1887 ("ICA"). The Hepburn Act amended the definition of transportation to "include cars and other vehicles and all instrumentalities and facilities of shipment or carriage, irrespective of ownership or of any contract, express or implied, for the use thereof . . . ." Ch. 3591, § 1, 34 Stat. 584 (1906) (emphasis added). This language was not amended until 1978, when Congress reworded the definition to include such facilities related to the movement of property, "regardless of ownership or an agreement concerning use." Ch. 101, 92 Stat. 1337, 1339 (1978). As the 1978 legislative history indicates, however, these changes were adopted for "clarity and consistency," H.R. Rep. 95-1395, at 21, reprinted in 1978 U.S.C.C.A.N. 3009, 3030, and therefore, did not alter the meaning of the original phrase. Congress again ratified this understanding when adopting the same definition of transportation in the ICCTA. See ICCTA, Pub. L. No. 104-88, 109 Stat. 803, 806 (1995). We thus consider the language and history of the provision adopted by Congress in the 1906 Hepburn Act to ascertain Congressional intent behind the scope of the phrase "regardless of ownership or agreement concerning use." See Lorillard, 121 S. Ct. at 2415 (majority opinion) ("We are aided in our interpretation by considering the

18

predecessor pre-emption provision and the circumstances in which the current language was adopted.").

The "evil of discrimination was the principal thing aimed at" in the passage of the Interstate Commerce Act. Louisville & N.R. Co. v. United States, 282 U.S. 740, 749 (1931) (citations omitted). See also George N. Pierce Co. v. Wells, Fargo & Co., 236 U.S. 278, 284-85 (1915); ICC v. Baltimore & O.R. Co., 145 U.S. 263, 275-77 (1892). In particular, Congress sought to eliminate the preferential rates given by railroad companies to certain shippers by declaring such discrimination unlawful and requiring railroads to publish their tariffs. ICA, Ch. 104, §§ 2 & 6, 24 Stat. 379, 379-82 (1887). The publication of tariffs prohibited railroads from the blatantly discriminatory practice of charging different rates to two similarly situated shippers through "secret agreements" favoring certain customers. Clyde B. Atchison, The Evolution of the Interstate Commerce Act: 1887-1937, 5 Geo. Wash. L. Rev. 289, 313-14 (1937). In 1903, the Elkins Act provided the ICC with enhanced powers to promote compliance with the Interstate Commerce Act's anti-discrimination provisions and to impose greater penalties for behaviors facilitating the unequal treatment of shippers. See Elkins Act, Ch. 708, §§ 1-3, 32 Stat. 847, 847-49. See also Atchison, supra, at 324-25 & n. 95.

Notwithstanding these initial attempts to ensure equal access to railroad facilities for all shippers, discrimination persisted in the railroad industry primarily because of a continuing lack of transparency in rate formulation. On the one hand, a private car company[7] could charge a shipper unlimited rates for the use of a private vehicle (such as a refrigeration car), and the shipper would have no recourse against such unregulated and unpredictable charges, as the private car line was not operated by the railroad and thereby not subject to provisions of the Interstate Commerce Act. On the other hand, in lieu of their earlier facially-discriminatory pricing policies, certain railroad companies began offering "discounts" on tariffs in exchange for the use of private cars, individual railroad switches, and other rail equipment owned by economically powerful shippers or private car companies. Such discounts were in excess of the true market value of the equipment temporarily used by the railroad. By thus "leasing" their equipment to the railroads or smaller shippers at inordinate rates that were not subject to public notice, these groups often received transportation services at prices below the levels of the published tariffs. Such favoritism resurrected the discriminatory treatment of smaller shippers. See generally 2 I.L. Sharfman, The Interstate

_____

[7] Private car lines did not transport passengers or property along railroad routes. They were companies, separate from rail carriers, that owned certain transportation equipment (e.g., different types of railroad cars) and, like some of the larger shippers, rented that equipment to shippers and railroad companies.

Commerce Commission: A Study in Administrative Law and Procedure 120-23 (1931); 1 The Economic Regulation of Business and Industry: A Legislative History of U.S. Regulatory Agencies 721-27 (Bernard Schwartz, ed. 1973) [hereinafter Economic Regulation] (statement of Rep. Esch). The situation regarding this discrimination was summed up thus by one contemporaneous commentator: "The shippers were beyond the Commission's control; the private-car lines, as such, were not embraced within the Commission's jurisdiction; and there was serious question as to whether the special services rendered in connection with the use of private cars were subject to its regulation." Sharfman, supra, at 122.

Legislators referred to these continuing evils of discrimination throughout the hearings and debates as the basis for expanding the definition of "transportation." See, e.g., 2 Economic Regulation, at 897 (statement of Rep. La Follette); 40 Cong. Rec. 8343 (1906) (statement of Rep. Townsend); 40 Cong. Rec. 6438-40 (1906) (statements of Sens. Tillman and Lodge); 40 Cong. Rec. 6374-77 (1906) (statements of Sens. Dolliver, McCumber and Kittredge). That such a view was commonly held among Members of Congress is evidenced by its explication

in the committee reports of each chamber.  See 2 Economic Regulation, at 820, 822

(Report of Sen. Tillman)[8]; 1 Economic Regulation, at 618, 619-20 (House Report).

The Interstate Commerce Commission (ICC), as the agency responsible for

oversight of the railroad industry pursuant to the Interstate Commerce Act, was

well aware of the discrimination perpetrated by backdoor dealings between railroad

companies and large shippers or private car lines.  See Sharfman, supra, at 122-23

(citing ICC Annual reports of 1889, 1893, 1903, and 1904).  When proposing to

Congress the legislation that would become the Hepburn Act, and particularly the

expanded statutory definition of "transportation," the Interstate Commerce

Commission noted the following:

> It will be seen that the changes proposed in the first section [of the
> Interstate Commerce Act] are designated (a) to somewhat increase the
> jurisdiction of the law as to the carriers subject to its provisions and
> (b) to bring within the scope of the law certain charges and practices
> which are not now subject to regulation, or respecting which there is
> dispute as to the power of the Commission . . . .  The second purpose

---

[8]     Although the Report of Senator Tillman cited herein is not technically a committee report of the Senate, Professor Schwartz explains that the Senate Commerce Committee could not produce a single report because the Senators in favor of the bill (i.e., the majority) could not agree on proposed amendments to the House bill and therefore could not produce a committee report.  See 1 Economic Regulation, at 610.  Only Senator Tillman submitted a report, and he became the floor leader for the bill.  See id.  Thus, the Tillman Report "is the nearest thing to a Senate committee report available . . . ." Id.  The Tillman Report is particularly reflective of Senate views with regard to the issue of defining "transportation," for the Senate eventually retained the House amended definition, which became law.  Compare 1 Economic Regulation, at 723 (statement of Rep. Esch, quoting proposed definition of "transportation" in House bill) with Hepburn Act, Ch. 3591, § 1, 34 Stat. 584 (definition of "transportation").

is sought to be accomplished by enlarging the definition of the term "transportation," so as to include the charges for various services, such as refrigeration and the like, which are now claimed to be beyond our authority . . . . [W]e do recommend that these [private car] charges should be put on the same basis as all other freight charges. They should be published and maintained the same as the transportation charge, and be subject to the same supervision and control. . . . In brief, the proposed measure amends certain sections of the act to regulate commerce and is confined to such recommendations as are deemed necessary to effect its intended purpose, and thereby furnish adequate protection against excessive and discriminating charges.

United States v. Pa. R.R. Co., 242 U.S. 208, 223-25 (1916) (quoting ICC's proposed bill and explanations before Senate Commerce Committee). The revised definition of "transportation" adopted by Congress in the Hepburn Act of 1906, including the language "irrespective of ownership or of any contract, express or implied, for the use thereof," was the exact language proposed by the ICC to provide it with the powers described above. See id. at 223.

The revised definition of "transportation" successfully addressed the hidden charges imposed on shippers by private car lines and larger shippers, thus furthering the original goal of the Interstate Commerce Act to eliminate discrimination in the railroad services provided to shippers. As described by one commentator,

The amended statute . . . defined "transportation" as to embrace cars, vehicles, and all other instrumentalities of shipment or carriage, irrespective of ownership or contract, and all services rendered in connection with the property transported – thereby endowing the

23

[ICC] with regulatory power over private cars and incidental services . . . . It [was] the instrumentalities and services of rail carriage which [had] been brought under the [ICC's] full sway; and it [was] through the control of these instrumentalities and services that the use of private cars and the operation of private-car lines [were] encompassed by the [ICC's] jurisdiction. The [ICC's] powers spring from the carriers' utilization of privately-owned equipment.

Sharfman, supra, at 124, 126 (emphasis added). That the addition of the phrase regarding ownership and contractual arrangements to the definition of "transportation" was intended to cover discrimination also seems to be the understanding of the ICC in the years shortly after the Hepburn Act went into effect.

Under the law as construed by the courts, car lines and others engaged in leasing cars to shippers are not common carriers and thus do not come under direct control by the [ICC]. When a car, regardless of ownership, is being moved in interstate commerce by a common carrier subject to the act, there is no doubt of our power to control the carrier's operation of the car so that there shall result no undue preference to any shipper.

In the Matter of Private Cars, 50 I.C.C. 652, 677 (1918) (emphasis added). Thus, even after the definition of "transportation" had been amended under the Hepburn Act to include equipment not owned by the railroads, the ICC recognized that its jurisdiction, while expanded, was still limited to those activities that served the railroads in fulfilling their tasks as common carriers, or that affected the general public through concerns of possible discrimination. See also Growers Marketing

24

Co. v. Pere Marquette Ry., 248 I.C.C. 215, 226-27 (1941); In the Matter of Contracts of Express Companies for Free Transportation of Their Men and Material Over Railroads, 16 I.C.C. 246, 250-51 (1909).

Given this statutory history, we reject FEC's reading of the phrase "regardless of ownership or agreement concerning use" found in the ICCTA's definition of "transportation." Congress employed this language specifically to grant the ICC jurisdiction over those facilities that, while not owned by the railroad companies, were nevertheless used in interstate commerce for the benefit of either the shipping public or the railroad companies themselves. Furthermore, even where the railroads owned the property in question, Congress explicitly intended that the leasing cost of equipment that constitutes "transportation" would be incorporated into the railroads' published tariffs so as to protect the public from the invidious discrimination characteristic of the era before the Hepburn Act. In this regard, the Supreme Court consistently has recognized the focus of the ICC's jurisdiction to be the protection of the general public rather than individual private entities. See, e.g., R.R. Ret. Bd. v. Duquesne Warehouse Co., 326 U.S. 446, 453-54 (1946); Merchants' Warehouse Co. v. United States, 283 U.S. 501, 507-11 (1931); United States v. Union Stock Yard & Transit Co., 226 U.S. 286, 304-06 (1912).

25

In this case, Rinker's use of the property at the 15th Street yard and the activities there performed by Rinker serve no public function and provide no valuable service to FEC; rather, the arrangement between FEC and Rinker merely facilitates Rinker's operation of a private distribution facility on FEC-owned premises. Furthermore, record evidence, such as Rinker's being the sole FEC customer to use the 15th Street yard, Rinker's taking responsibility for its utility expenses on the property, and a sign on the property reading "CSR Rinker -- West Palm Beach -- Aggregate Distribution," indicates that Rinker's operation served a purely private function. As stated by the district court, "Rinker effectively ran a Rinker operation on FEC property." 110 F. Supp. 2d at 1371. The factual findings supporting the district court's conclusion are not clearly erroneous. We also find that the district court properly applied the law to these facts in concluding that Rinker's activities at the 15th Street yard were not "rail transportation." Contrary to FEC's suggestion, therefore, the ICCTA's pre-emption of state regulation of rail "transportation" does not preclude a determination that certain actions taken by West Palm Beach, which might or might not be pre-empted if taken against FEC,

do not violate the Supremacy Clause when applied against Rinker in its operations on FEC property.[9]

**History and Purpose of the ICCTA**

Our conclusion as to the meaning of the ICCTA pre-emption provision is bolstered by the history and purpose of the ICCTA itself. The statutory changes brought about by the ICCTA reflect the focus of legislative attention on removing <u>direct</u> economic regulation by the <u>States</u>, as opposed to the incidental effects that inhere in the exercise of traditionally local police powers such as zoning. The pre-ICCTA statute expressly authorized regulation of certain railroad activities to be undertaken concurrently by the federal and state governments, while still other regulation would be the exclusive province of state law. For example, former section 10103 of Title 49 provided that "[e]xcept as otherwise provided in this subtitle, the remedies provided under this subtitle are <u>in addition to</u> remedies

---

[9]     In emphasizing that the scope of the pre-emption provision is limited to the direct regulation of rail transportation, we do not mean to suggest that only regulations applied against railroads are pre-empted by the ICCTA. Certain local regulations applied against a third-party may be so intertwined with the provision of rail transportation services to the public so as to frustrate the objectives of federal railroad regulation. Likewise, some regulations applied directly to railroads may not necessarily be pre-empted. See <u>N. Y. Susquehanna and W. Ry. Corp.</u>, STB Fin. Docket No. 33466, 1999 WL 715272, at *4-5 & n. 7 (Sept. 9, 1999) (suggesting that environmental regulation on dumping of waste, as applied to railroads, would not be pre-empted) (quoting <u>Cities of Auburn and Kent, Wash. -- Petition for Declaratory Order -- Burlington N. R.R. Co. -- Stampede Pass Line</u>, STB Fin. Docket No. 33200, 1997 WL 362017, at *6 (July 2, 1997), <u>aff'd</u>, <u>City of Auburn</u>, 154 F.3d 1025).

existing under another law or at common law." 49 U.S.C. § 10103 (1988) (emphasis added). Concurrent federal-state authority was also contemplated for much intrastate railroad activity. See, e.g., 49 U.S.C. § 10501(b)-(d) (1988). Federal law also recognized exclusive state authority over "the construction, acquisition, operation, abandonment, or discontinuance of spur, industrial, team, switching, or side tracks if the tracks are located, or intended to be located, entirely in one State . . . ." 49 U.S.C. § 10907(b)(1) (1988). See also 49 U.S.C. § 11501(b) (1988) (acknowledging regulatory role of States over railroads). The ICCTA removed the authority of the States to regulate those railroad activities that had previously been subject to state regulation or to concurrent federal-state regulation, providing instead for federal uniformity in the regulation of rail transport. See 49 U.S.C. § 10501 (1994 & Supp. 1998).[10]

When identifying the principles of national "rail transportation policy" under the ICCTA, Congress deleted the previous statutory reference to "cooperat[ion] with the States on transportation matters to assure that intrastate regulatory

---

[10]    The loss of that state regulatory authority has been the focus of much of the caselaw on the pre-emptive effect of the ICCTA. See, e.g., Burlington N. Santa Fe Corp. v. Anderson, 959 F. Supp. 1288 (D. Mont. 1997); CSX Transp., Inc. v. Ga. Pub. Serv. Comm'n, 944 F. Supp. 1573 (N.D. Ga. 1996); Burlington N. R.R. Co. v. Page Grain Co., 545 N.W.2d 749 (Neb. 1996). While these cases have addressed the extent to which States still may be able to prevent stations from closing or tracks from moving, none have involved the general exercise of local police powers against a third party which has an incidental effect upon a railroad's activities.

jurisdiction is exercised in accordance with the standards established in this subtitle." Compare 49 U.S.C. § 10101a(9) (1988) with 49 U.S.C. § 10101 (1994 & Supp. 1998). This deletion emphasizes the focus of the ICCTA on removing direct state regulation of railroads previously permitted for intrastate rail transport. The principles of national "rail transportation policy," as continued from the previous statute, further reveal a general deregulatory focus, see 49 U.S.C. § 10101 (1994 & Supp. 1998), but the regulation sought to be "minimize[d]" is at the federal (not local) level. 49 U.S.C. § 10101a(2) (1988); 49 U.S.C. § 10101(2) (1994 & Supp. 1998). One House Report emphasized the balance sought to be achieved between the rights of States in the exercise of their police powers and the need for exclusivity in the "Federal scheme of economic regulation . . . . Any other construction would undermine the uniformity of Federal standards and risk the balkanization and subversion of the Federal scheme of minimal regulation for this intrinsically interstate form of transportation." H.R. Rep. 104-311, at 96 (1995), reprinted in 1995 U.S.C.C.A.N. 793, 808. One Senate Report noted the following:

> [N]othing in this bill should be construed to authorize States to regulate railroads in areas where Federal regulation has been repealed by this bill . . . . The hundreds of rail carriers that comprise the railroad industry rely on a nationally uniform system of economic regulation. Subjecting rail carriers to regulatory requirements that vary among the States would greatly undermine the industry's ability

29

to provide the "seamless" service that is essential to its shippers and would waken the industry's efficiency and competitive viability.[11]

S. Rep. 104-176, at 6 (1995) (emphasis added). Finally, the report describing the bill as it appeared in its final form after conference committee stated as follows:

> The Conference provision [of 49 U.S.C. § 10501(b)] retains this general rule [of increased exclusivity for Federal remedies], while clarifying that the exclusivity is limited to remedies with respect to rail regulation — not State and Federal law generally. For example, criminal statutes governing antitrust matters not pre-empted by this Act, and laws defining such criminal offenses as bribery and extortion, remain fully applicable unless specifically displaced, because they do not generally collide with the scheme of economic regulation (and deregulation) of rail transportation.

---

[11]    In this regard, FEC's argument suggesting a conflict between the application of the West Palm Beach ordinances in this case and federal railroad policy is particularly inapt. FEC's claim of pre-emption is based essentially on the supposed interference of West Palm Beach with the railroad's efficient allocation of its resources (by leasing its property to Rinker instead of performing such services itself). This microeconomic focus is not consistent with the stated purposes of the ICCTA. In reducing the regulation to which railroads are subject at state and federal levels, the ICCTA concerns itself with the efficiency of the industry as a whole across the nation. See 49 U.S.C. § 10101 (1994 & Supp. 1998). No statement of purpose for the ICCTA, whether in the statute itself or in the major legislative history, suggests that any action which prevents an individual firm from maximizing its profits is to be pre-empted. Naturally, at some level, all regulation places constraints on firms' profit-maximizing behavior; to allow FEC's argument to prevail would subsume all local regulation to the profit-maximizing priorities of individual railroad companies. The nationwide efficiency of the railroad industry, however, may still be preserved without necessarily denying the possibility of all local regulation. Cf. Hayfield N. R.R. Co. v. Chicago & Northwestern Transport. Co., 467 U.S. 635-36 (1984) (unanimous decision):

> Appellee also maintains that allowing appellant to bring condemnation proceedings after abandonment would contravene the overall purpose of the [Interstate Commerce] Act: to make the railroad industry more efficient and productive. . . . In light of Congress' imposition of solutions that subordinate opportunity costs to other considerations, state condemnation authority is not pre-empted merely because it may frustrate the economically optimal use of rail assets.

30

H.R. Conf. Rep. 104-422 (1995), at 167, reprinted in 1995 U.S.C.C.A.N. 850, 852 (emphases added). Allowing localities to enforce their ordinances with the possible incidental effects such laws may have on railroads would not result in the feared "balkanization" of the railroad industry as companies sought to comply with those laws. Unlike direct regulation of railroads, which is not the case with the West Palm Beach zoning ordinance, and which was the focus of the statutory changes to the ICCTA, the zoning ordinances with which Rinker must comply, do not burden FEC with the patchwork of regulation that motivated the passage of the ICCTA. Cf. Cipollone, 505 U.S. at 519 (recognizing existence of diverse state and local regulations as "catalyst" for passing federal legislation). While perhaps not optimally efficient for FEC's operations, West Palm Beach's zoning requirements do not impede the interstate functioning of the railroad industry.[12]

---

[12] FEC places great emphasis on the City's hostile motivation in its enforcement of the zoning ordinance against Rinker. Quoting testimony by the Mayor of West Palm Beach, FEC argues that the City intended to impose additional costs on FEC and thereby sought to discontinue FEC's railroad operations in the residential area where the 15th Street facilities are located. See FEC Initial Br. at 44-46. That the City hoped FEC would move its railroad operations elsewhere is not relevant to our analysis: in evaluating whether the local regulation is pre-empted by the federal law, we focus on the federal statute (including its mandates and purposes) and determine the extent to which the actual effects of the local regulation interfere with the intended functioning of the federal law. See Egelhoff v. Egelhoff, No. 99-1529, 121 S. Ct. 1322, 1326-28 (Mar. 21, 2001). Cf. Teper v. Miller, 82 F.3d 989, 995 (11th Cir. 1996) ("[I]t is the effect of the state law that matters in determining preemption, not its intent or purpose.") (emphasis in original). Even if the City's intentions are as FEC suggests, we nevertheless conclude that there is no frustration of the federal objective, and so the application of the local regulation must be upheld. See Hayfield Northern, 467 U.S. 622 (where companies acting pursuant to state condemnation statute sought specifically to prevent railroad's abandonment of

31

## Conclusion

As the exercise of a traditionally local police power, West Palm Beach's zoning and occupational license ordinances are entitled to an assumption of no pre-emption when evaluated pursuant to the Supremacy Clause. Against this presumption of validity, we conclude that the application of the ordinances against Rinker, based on the facts found by the district court, does not qualify as "regulation of rail transportation" and does not frustrate the objectives of federal railroad policy. The judgment of the district court is therefore **AFFIRMED**.

---

line, state condemnation statute was nevertheless not pre-empted because federal statute did not occupy field and federal objectives had not been frustrated).